LAWRENCE J. McLAUGHLIN AND OLGA McLAUGHLIN, HIS WIFE, PLAINTIFFS-APPELLANTS, v. ROVA FARMS, INC., A NEW JERSEY CORPORATION, AND HERMAN SCHULZ, DEFENDANTS-RESPONDENTS.

Argued March 16, 1970—Decided June 22, 1970.

292

*Mr. Nicholas R. Rapuano* argued the cause for appellants (*Mr. Richard Wildstein* on the brief; *Messrs. Gelman & Gelman,* attorneys).

*Mr. William R. Morrison* argued the cause for respondents (*Mr. Milton D. Liebowitz* on the brief; *Messrs. Liebowitz, Krafte & Liebowitz,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. Plaintiff Lawrence J. McLaughlin was seriously injured on July 25, 1965 when he dove from what was described as a diving platform into the water of a lake on recreation and resort premises owned and maintained by defendant Rova Farms, Inc. Thereafter he brought this suit against Farms and its general manager, defendant Herman Schulz, to recover damages for his personal injuries and consequent monetary losses. Plaintiff Olga McLaughlin, wife of Lawrence, joined in the action seeking a recovery for loss of his services, society and consortium. In support of their claim, plaintiffs alleged that the injuries suffered by Lawrence were caused either by defendants' willful and wanton mis-

conduct or negligence under the circumstances to be described hereafter. Over defendants' objection, the trial court submitted both issues, as well as the defensive claim of contributory negligence, to the jury for determination. Unanimous verdicts of $210,000 for Lawrence McLaughlin and of $15,000 for Olga McLaughlin were returned against both defendants.

On appeal the Appellate Division reversed in an unreported opinion holding that it was error to submit the issue of willful and wanton misconduct to the jury. We granted certification. 55 N. J. 162 (1969). For reasons to be stated, we have concluded that the trial court's action was correct and that plaintiffs' judgments should be reinstated.

I

For a number of years defendant Rova Farms, Inc. had operated and maintained a recreation resort in Jackson Township, New Jersey. The premises consisted of 654 acres at the time in question, and contained therein a restaurant, hotel, motel, snack bar, pavilion, picnic area, and lake. The public was invited to patronize the facilities and, upon entering the premises by car, there was a parking charge of one dollar. Payment of that fee carried with it the right to use the beach and the lake.

At one point in the swimming area there was a wooden structure from the end of which Lawrence McLaughlin dove into the water. It was variously referred to as a dock, pier, and diving platform. It began at the edge of the lake and extended 17'10" out over the water. The flooring was 5'10" wide and consisted of six thick planks or boards permanently affixed to an understructure. On each side there was a fence-like construction with top rails and spaced supporting uprights. It was built along the outside edge of the flooring and was nailed to the sides thereof. The top rails appeared to be about four feet above the walking surface. A significant factor from the standpoint of this case

is that the flooring planks extended about six feet farther out over the water beyond the end of the siderails. Thus, looking at the structure from either side (as the photographs in evidence clearly show), a person would see a wooden projection without sides extending out over the water. Undoubtedly the extension was the reason why defendant Schulz referred to the facility as "the area diving board." There was no spring to the projection, however, and probably for that reason plaintiffs' well qualified expert called it a "diving platform." The end of the platform was four feet above the water. At this point underneath the platform and in the immediate vicinity, the depth of the water was 3 to 4 feet. There were no steps or ladder leading from the end of the planking, or from either side of the structure itself, down into the water. Nor was there any sign or warning anywhere on the platform or on shore notifying an intending diver of the shallowness of the water. On land a short distance away and almost in a line with this wooden structure there was a sign bearing the legend "Swimming and diving at your own risk." Much emphasis was placed on this sign by defendants at the trial. However, in our view, it cannot be deemed a prohibition against diving from the projecting platform. Rather its general admonitory nature would appear to make it relate to the entire lake, including a second wooden structure at another point on the lake shore which defendants allege was an adult diving area. That structure, which plaintiffs characterize as a "dock," runs parallel with the water edge for some distance, extending only a relatively few feet over the water. Its three sides which were over the water were fenced for their full width and length except for a gate-like opening near the side fronting on the water. There was no plank or platform projection beyond the fencing at the point of the opening like the one on the "diving platform." There was no sign indicating that this more dock-like structure was set aside for diving or that diving was limited to that place; nor, on the other hand, was there anything to inform a patron that it would

be improper or unreasonable or dangerous to dive from it. In any event, defendant Schulz's 16 year old son, who was acting as temporary lifeguard on the day of Lawrence McLaughlin's accident, in explaining the reason for the sign "Swimming and diving at your own risk," said it was "to protect the interest of the corporation." In our view it was reasonably open for the jury to find that the sign did not prohibit but rather authorized diving and warranted belief by a patron that diving from the diving platform could be engaged in, and that it would be attended only by the risks ordinarily inherent in such sporting activity.

Defendant Herman Schulz, the Farms' manager, who had general supervision over all the resort operations, testified by pretrial deposition that he was a carpenter and builder. In the early part of May 1965 he repaired the wooden structure which contained the diving platform (what he called "the area diving board") so as to put it into condition for the forthcoming season. It was provided for the use of children and guests. He knew the water under the platform was 3 to 4 feet deep. At one side or end of the lake there was a dam which could be manipulated to permit the entry of more water to increase the depth of the lake. Despite such knowledge, prior to McLaughlin's accident no effort was made to raise the water level above the 3 to 4 foot depth. Schulz said that if the water was low he would not allow people to dive from the platform. He conceded also that no one told an intending diver of the depth of the water under the projecting planks, and that no notice was placed on the platform or elsewhere on which the depth was noted.

Defendants attempted to establish that the diving platform was either not for diving or for children's diving or jumping into the water. But there was no notice posted or given to that effect. Moreover, there was a roped-off area some distance away which was set aside for children. It was marked by a sign saying "Bathing area for children under 12 years. Parents must supervise." That was the only notice pertaining to children's use of the lake.

Leo Schulz, the 16 year old temporary lifeguard who was on duty on the day of McLaughlin's accident, testified that the platform was not for diving. But he had observed people using it at times for that purpose. On occasions he would station himself on or near the structure and tell bathers not to dive. When he was sitting on the lifeguard stand some distance away, he would blow his whistle if he saw anyone about to do so. He knew the water was 3 to 4 feet deep at the end of the platform, but he never posted a sign or advised anyone of that fact.

A conflict developed as to the physical appearance of the diving platform at the time of the accident. Schulz testified that in early May 1965, before the season began, he painted "no diving" in large white letters on the end of the platform. While he was testifying, he identified three photographs as portraying the platform and the children's bathing area on July 25, 1965. One of them showed only the end of the platform wih "no diving" painted thereon in sizeable clean white letters. Schulz did not know when the pictures were taken or who took them. (The person who did take them was not produced by the defense.) It seems obvious from looking at two of them, however, that they were not taken during the summer season of the year. Schulz himself noted on cross-examination the barren appearance of the many trees and the foliage in the lake area in the background and conceded that the pictures must have been taken in the fall. By way of contrast, four photographs introduced by plaintiffs to show conditions in July clearly portray the trees and foliage in full bloom. One of these four pictures, all of which apparently were taken at the same time, shows a close-up of the diving platform. The words "no diving" do not appear thereon. This picture, which was introduced by plaintiffs in rebuttal, was received in evidence over defendants' objection. Its admissibility is likewise questioned on this appeal. We find no abuse of the trial court's discretion in allowing its introduction. Moreover, McLaughlin, whose deposition was read at the trial,

testified that he saw no such sign on the platform before he dove from it. It may be noted also that defendants called Nikola Krasnoschokow as a witness in their behalf. He had visited the Farms for the religious holiday for eight years and had arrived from Canada on July 23, two days before the accident. On July 25 he was sitting on a bench near the water and the diving platform when McLaughlin dove from the platform. Krasnoschokow testified he had walked on the "diving board many times." Yet he did not say he ever saw the words "no diving" painted at the edge of the platform.

The above generally described the defendants' premises and the conditions around the lake on July 25, 1965. Shortly before noon on that day McLaughlin, who was then 24 years old, his wife, to whom he had been married for two weeks, and four members of her family drove into the Farms in two cars, parked them and paid the required parking fee. A special religious holiday known as St. Vladimir's Day was being celebrated and there were several thousand people on the premises. The plaintiff Lawrence McLaughlin and his wife were not participants in the celebration. Although Mrs. McLaughlin had visited the Farms on other occasions, it was Lawrence McLaughlin's first appearance there.

The McLaughlin party had a picnic lunch and around 5:00 P.M. Lawrence decided to go swimming. He considered himself a "good" swimmer. He had been in the Coast Guard and had had basic swimming training in boot camp. The record does not show that he ever had any instruction in diving. He went into the lake near the children's area, about 50 feet to the right of the wooden facility containing the diving platform. He took a few steps into the water "to get wet," immersed himself, walked back out and then headed toward the entrance to the diving platform which he said was in the adult swimming area. (According to Mrs. McLaughlin the water was a brownish-green color with grass-like seaweed on the top. She said she could not see her

feet when she was standing in it.) McLaughlin said that he went to the end of the platform and paused there momentarily. He saw adults swimming and floating about 10 feet farther out in the water. He looked down toward the water, could not see the bottom, raised his arms above his head and dove in. He did not know the depth was only three to four feet; no one had told him and there were no signs to inform him. He struck the bottom and suffered tragic injuries, sustaining fractures of the fourth and fifth cervical vertebrae and damage to the spinal cord. His body is paralyzed from the fifth cervical vertebra down and he has very little movement of his arms. He is almost a total quadriplegic and the condition is permanent.

The lifeguard was not on the diving platform or on his stand when the accident happened. He said he was giving first aid treatment to a bather who had cut his foot. On hearing people calling, he went into the water and brought the unconscious McLaughlin in to shore. From there McLaughlin was removed to the hospital.

At the trial, plaintiffs produced an expert in swimming and diving. The witness had been head coach of swimming and diving at Princeton University for 10 years. Previously he had coached at Darthmouth College and at West Point and had been on the faculty of the National Red Cross Aquatic School. He had read extensively on the subject of diving and was the author of a book entitled "Young Sportsman's Guide to Diving." He had many years of experience in national and international competitive diving, including participation in two Olympic Games and the Pan American Games. As a professional diver he went on several international tours, as a so-called "good-will ambassador," during which he conducted swimming and diving clinics and gave diving exhibitions in many countries around the world. He was familiar with all kinds of diving boards and platforms and had used at least 300 varied types over his long career. He was familiar with standard water depth requirements

for diving safety and had served as a consultant for architects on proper depths of water under diving facilities.

The witness was familiar with the diving platform involved in this case from examination of the photographs in evidence as well as actual observation of it. He testified that since the edge of the platform was four feet above the water, a water depth of three to four feet thereunder was not safe. It was not deep enough to prevent someone from being hurt. In his opinion there was no such facility as a "children's diving board," but in any event, this platform, four feet above the water, was not safe either for children or adults. In his view, the facility should never have been opened for diving; it was "the most dangerous facility [he had] ever seen built for diving." It could have been made safe by digging or dredging the area in front of the diving platform to make a "safe depth," which, for such a platform four feet above the water, should be 10 feet. His testimony indicates further that in water three to four feet deep by the time an adult diver's hands hit the bottom about half of his body would still be out of water, and the resistance of the shallow water would not slow him down sufficiently to avoid injury. If the depth had been 10 feet the density of the water would cause sufficient deceleration to insure safety.

On cross-examination he said that even assuming the words "no diving" were on the end of the platform, it was still an unsafe facility because people were, in fact, allowed to jump and dive from it. If such words were there, there should have been a railing or a lifeguard present to prevent people from diving. The witness acknowledged that a recognized principle of diving instruction is that a person should not dive into water of unknown depth. He gave that advice in his teaching and conceded that the principle appears in the swimming and diving manuals which are recognized as standard for instruction purposes and are issued by the American Red Cross and Boy Scouts of America. And he

said that a trained person would not dive into water of unknown depth.

The defense also produced an expert in swimming and diving. Although his qualifications were not as impressive as those of plaintiffs' witness, he was adequately qualified to testify. He testified that he was familiar with "standards" for diving into water and that "no one dives into unknown water whether he is a trained swimmer or an untrained swimmer. They are taught to jump into water to determine the depth first." The witness identified two of the American Red Cross swimming and diving manuals which had been shown to plaintiffs' expert. He said they contained safety codes with reference to swimming and diving and that they were "generally recognized and accepted as safety codes in the water front safety industry." They were then offered in evidence and rejected on plaintiffs' objection. That ruling was made one of the grounds of appeal.

When the matter was presented on oral argument, we requested that the allegedly pertinent competent parts of the manuals (which had been marked D1 and D2 for identification at the trial) be supplied for our consideration. Our examination leads us to conclude that, even assuming they were admissible, which we need not decide, exclusion was within the trial court's discretion and did not constitute prejudicial error. It appears to us that defendants wished to show principally that the manuals advised against diving into water of unknown depth. (There is no reference in their brief to the specific portions thereof alleged to be admissible.) But both plaintiffs' and defendants' experts had so testified and plaintiffs' expert expressly said the manuals contained the advice referred to. Moreover, both of them agreed that bathers should not dive into unknown water. In addition, one of the manuals contains a statement which might well prejudice defendants' case and support that of plaintiffs. It will be recalled that plaintiffs' expert said that with a diving platform four feet above the water, the re-

quired depth for safe diving was 10 feet. The manual says, "For low springboards up to one meter in height [*i. e.,* about three feet three inches] above the surface of the water, water eight feet deep is the minimum requirement for safety." Even though this standard relates to a low springboard, on the facts present in this case it is unlikely that the statement would influence a jury to accept water three to four feet deep as a proper discharge of Farms' duty of care toward its swimmer-invitees.[1] Defendants claim also that the trial court erred in refusing to allow their expert witness to give his opinion as to whether "the standards" had been observed "in constructing and maintaining the dock on its premises." In its opinion, the Appellate Division recognized the inadequacy of the foundation laid for the question. But since a retrial was ordered it went on to say that

"* * * it had been established earlier that the expert had inspected the facilities, and he thus was qualified, if he first described the facilities (about which there was little factual dispute), to state an opinion as to their meeting the applicable standards, without need to formulate his opinion in response to a hypothetical question. * * * We assume that at the retrial defendants will be prepared to lay a proper foundation for their expert's opinion."

The record shows that defendants' expert had never inspected the so-called dock or diving platform. He had been on the premises only once and that was in June 1968, a few days prior to his appearance as a witness. Apparently the entire structure, including the diving platform, had been taken down and although the season usually opens on May 31, it had not been reconstructed or reinstalled.

Defendants failed to set out in their brief the precise questions they allege should have been allowed. Nevertheless, we have examined the full record of the witness' testimony and are satisfied that the foundation laid for them was so

---

[1] See *Cummings v. Borough of Nazareth,* 427 Pa. 14, 233 A. 2d 874 (1967) where the expert testimony showed that depths ranging from 9 feet to 12 feet beneath a one meter diving board were required.

inadequate as to justify the trial court in declining to receive his opinion as to whether the "dock" conformed to construction standards.

At the end of the proof, the trial court concluded that jury questions existed as to whether defendants' action in creating and maintaining the diving platform for the use of invitees of the premises constituted willful and wanton misconduct or negligence, and whether the plaintiff Lawrence McLaughlin was guilty of contributory negligence.

## II

█ On this appeal defendants argue, as they did successfully in the Appellate Division, that the trial court erred in submitting the issue of willful and wanton misconduct to the jury. If that be so, since there was no specification by the jury whether its verdict was based on a finding of willful and wanton misconduct or of negligence, the reversal of plaintiffs' judgment must be sustained. *King v. Patrylow,* 15 *N. J. Super.* 429, 436 (App. Div. 1951).

██ Defendant Farms[2] invited the public to make use of its resort and recreation area, including its lake. The fee required was one dollar for parking. Presumably additional consideration stemmed from visitor patronage of the restaurant and bar facilities. Such an operator owed to its invitee the duty of exercising reasonable care for his safety —*i. e.,* care commensurate with the risk of being upon the premises or of using any of the facilities provided for his use or enjoyment. As far as the lake is concerned, in constructing, supplying and maintaining facilities or accommodations provided for patrons of the lake, Farms was bound

---

[2] The case was submitted to the jury on the theory that at and prior to the accident Farms was in charge of its agent Schulz, its general manager, and that he and his employer could be found jointly liable to plaintiffs. The individual responsibility of Schulz was not made an issue on this appeal and the discussion of liability will be in terms of Farms' responsibility.

to use care to have and keep them in a reasonably safe condition for the purpose for which they were apparently designed. If for any reason they were not reasonably safe and suitable for the use for which they were apparently adapted, the public should be excluded therefrom entirely or be given appropriate notice of the unsafe or unsuitable condition and the consequent danger. *Waddel's Adm'r v. Brashear*, 257 *Ky.* 390, 78 *S. W.* 2d 31 (1935).

 The diving platform in the present case and the water underneath were accommodations and facilities which Farms furnished to McLaughlin, and the jury was justified in finding that the platform was adapted for diving and that he was using it in a customary way for that purpose. Moreover, upon the making of such a finding, it would follow in our judgment that Farms was under the duty of being diligent to see that the water beneath the platform was of sufficient depth to be reasonably safe for the purpose of diving. If it was not, then the accommodation was clearly a dangerous instrumentality. *Cummings v. Borough of Nazareth, supra*, 233 *A.* 2d 877. Additionally, assuming it was reasonable to conclude, as the jury undoubtedly did, that the platform was provided in part at least for diving, its presence at the location constituted an invitation to McLaughlin to use it for that purpose, as well as an implied representation by Farms that the use would not be dangerous. McLaughlin was entitled to assume that Farms had discharged its duty of seeing to it that the water was of reasonably safe depth and that if that depth was not present he would be warned of the obvious danger or excluded from the facility. Thus he was not obliged to make a critical examination but could act on the belief that defendants would not invite him to use a dangerous facility. *City of Ferguson v. Marrow*, 210 *F.* 2d 520 (8 Cir. 1954) ; *Waddel's Adm'r v. Brashear, supra*, 78 *S. W.* 2d 31; *Hanson v. Christensen*, 275 *Minn.* 204, 145 *N. W.* 2d 868 (1966) ; *Boll v. Spring Lake Park, Inc.*, 358 *S. W.* 2d 859 (Mo. Sup. Ct. 1962) ; Annotation, Liability of private owner or operator of bathing resort or

swimming pool for injury or death of patron, 48 *A. L. R. 2d* 104, 129 (1956).

The injury and death cases cited above were predicated on charges of negligence. In no one of them was a claim of willful and wanton misconduct discussed. But in none of them were circumstances of such an aggravated nature as those presented here. The problem to be resolved here is whether plaintiffs' proof created a factual issue for jury determination as to whether Farms' conduct constituted such an "advanced degree" of negligent misconduct as to warrant a determination of willfulness and wantonness as that concept has evolved in our cases. See *Krauth v. Israel Geller and Buckingham Homes, Inc.*, 31 *N. J.* 270, 277 (1960).

In our State, in order to recover for injuries allegedly produced by willful and wanton misconduct, it must appear that the defendant with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result. *Krauth v. Israel Geller and Buckingham Homes, Inc., supra; Egan v. Erie R. Co.*, 29 *N. J.* 243, 254–255 (1959) ; *Staub v. Public Service Railway Co.*, 97 *N. J. L.* 297, 300 (E. & A. 1922) ; *Tabor v. O'Grady*, 61 *N. J. Super.* 446, 454 (App. Div. 1960) ; *King v. Patrylow, supra*, 15 *N. J. Super.* at 433; *Taylor v. Lawrence*, 229 *Or.* 259, 366 *P. 2d* 735 (1961) ; *Williamson v. McKenna*, 223 *Or.* 366, 354 *P. 2d* 56 (1960) ; *Restatement, Torts* 2d § 500, p. 587 (1965).

It is not easy to set down a readily usable definition of willful and wanton misconduct. There is no simple formula which will describe with exactness the difference between negligence and willful and wanton misconduct. The concept of misconduct ranges in a number of gradations from slight inadvertence to a malicious purpose to inflict injury. The fact that the differences in gravity of fault cannot be stated

with mathematical precision should not prevent the courts from administering a scheme of liability which is based upon the seriousness of the actor's misconduct. *Williamson v. McKenna, supra,* 354 *P.* 2d 56.

As this Court indicated in *Krauth v. Israel Geller and Buckingham Homes, Inc., supra,* 31 *N. J.* 270, willful and wanton misconduct signifies something less than an intention to hurt. To establish that condition it is not necessary that the defendant himself recognize his conduct as being extremely dangerous; it is enough that he know, or has reason to know, of circumstances which would bring home to the realization of the ordinary reasonable man the highly dangerous character of his conduct. *Taylor v. Lawrence, supra,* 366 *P.* 2d at 739; *Restatement, Torts* 2d, *supra,* § 500, comment *c.* p. 589.

In *Greetan v. Solomon,* 47 *Wash.* 2d 354, 287 *P.* 2d 721 (1955) it appeared that the owners of an apartment house either knew or had good reason to anticipate with a high degree of probability that the tenants or their guests would, after the evening meal, undertake to deposit refuse in garbage cans located in the rear of the lot, and that in the fall or winter season the attempt would be made during the hours of darkness. The owners maintained clotheslines in the rear yard for use of the tenants. The lines sagged and a tenant taking a direct path to the garbage cans would have to "duck" under them. On the day of the accident defendants commenced an excavation which was to be six feet long, four feet wide and four feet deep, the purpose being to install a new septic tank. The digging was done by a 16 year old boy in the location specified by defendants. He ceased working at dusk at which time he left an unguarded excavation six feet by four feet and over a foot in depth across the path which it was highly probable a tenant would take on the way to the garbage cans. No barrier or covering or light or warning of any kind was left at the site. Some time after dark the plaintiff, guest of a tenant, left an apartment with a bag of refuse to be placed in the cans. While proceeding

along a route designed to avoid the sagging clotheslines she fell into the excavation and was injured. In sustaining her damage award against the defendants, the court said:

"Under such circumstances and conditions a reasonable man should know, or would have reason to know, that the leaving of an unguarded excavation six feet by four feet in size and over a foot in depth, without any kind of warning or barrier, constituted a potential source of substantial harm to such persons. It appears clear to us, therefore, that this conduct (or misconduct) on the part of appellants was done in reckless disregard of its probable consequences and, in our opinion, constituted wanton misconduct * * *." 287 *P.* 2d at 725.

In *King v. Patrylow, supra,* 15 *N. J. Super.* 429, the defendant operated a picnic grove on which it maintained a shooting gallery under the charge of an employee, Patrylow. King, an 11 year old boy, who was in the grove with his mother, was attracted to the gallery and spent much of his time watching patrons shoot at targets. The rifles were chained to the counter in front of the gallery and the expended shells fell to the ground on either side of the counter. Around 9:00 P.M. Patrylow was preparing to close the gallery. It was his practice to shoot each rifle to empty it of bullets. The boy asked and was given permission to enter the gallery to pick up the expended shells from the ground. Patrylow opened a side door to allow him to get behind the counter. The boy then moved along the counter to a point three or four feet from the door, and with his right hand resting on top of the counter he leaned over to gather up the shells with his left hand. Patrylow, who was outside the counter, picked up the rifle at the end of the counter between the boy and the door. He knew the boy was to his right two or three feet from the location of the gun. He pointed the gun slightly to the left toward the ground and fired. Although he could have aimed it toward the top of the range or at the targets at the rear, and although there was ample space to the left to discharge the gun with safety, the bullet struck the boy's right hand which was resting on the counter.

In sustaining a verdict for the boy based on a "willful and wanton injury" theory, the Appellate Division quoted the following excerpt from the *Restatement, Torts,* § 500:

"The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to others to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him."

*Atlas Properties, Inc. v. Didich,* 226 *So.* 2d 684 (Fla. Sup. Ct. 1969) is a pertinent case. There, the defendant operated a swimming pool. The plaintiff, a 13 year old girl, was drowned when her arm was caught in an uncovered filter pipe at the bottom of the pool. The defendant had knowledge of the danger incident to absence of a cover over that drain. In the subsequent death action an award of punitive damages was sustained. Such damages were held proper because the circumstances warranted a conclusion of wanton misconduct. See also *Tabor v. O'Grady, supra,* 59 *N. J. Super.* 330, *same case on reh.* 61 *N. J. Super.* 446 (App. Div. 1960); *Bogle v. Conway,* 198 *Kan.* 166, 422 *P.* 2d 971 (1967).

In the present case we are satisfied that the totality of the evidence established a factual question for jury decision as to whether defendant Farms' acts and omissions constituted willful and wanton misconduct. It constructed and maintained the dock extending into the water with planking projecting beyond the terminal points of the side rails and about six feet farther out over the water. Thus the structure was given the appearance of a diving platform. Farms, as the profit-motivated provider of the lake and that facility as an incident to its use and as knowing or being charged with knowledge that it would probably be used for diving purposes, must be deemed to have extended an invitation to use it for that purpose. Consequently, defendant came under a duty to exercise due care to make

it reasonably safe for such use. In this connection, in measuring the required care, obviously the greater the likelihood of danger the greater the amount of care required.

The diving platform was built four feet above the surface of the water. Defendant knew the lake had a soil bottom, that the water was not clear and that it was unlikely that an intending diver could see the bottom. But defendant and its agents also knew a most significant fact, that the water off the end of the platform was only three to four feet deep. The testimony clearly indicates that this was the usual depth and that defendant so considered it. The depth could have been increased by use of the dam, but apparently defendant felt no need to do so. The same result could have been accomplished by some dredging of the area underneath the projecting planks.

Obviously, as a facility for diving, the platform was extremely hazardous, and a jury would be warranted in finding that any reasonably prudent operator of the lake would be or should be aware of the danger. In fact, once a jury found that the location and appearance of the structure gave an invitation to dive therefrom into the three or four feet of water, a sequential conclusion seems inescapable, i. e., that injury to a diver who yielded to the invitation was probably inevitable. Plaintiffs' expert said the facility was the most dangerous he had ever seen, and that diving from it never should have been allowed. In our view, it would have been surprising if the jury had not agreed with him.

The magnitude of the hazard to which Farms exposed Lawrence McLaughlin was increased further through its failure to warn him of the shallowness of the water or to notify him (as the jury could have found it had failed to do) that diving was prohibited. Further, if Farms did not intend to allow diving, it was reasonable for the jury to infer that the deceptive allure of the projecting platform as an invitation to do so could have been negated simply by continuing the sides of the structure to the end of the planking and then across its front.

Under the circumstances, we believe that defendants' affirmative action in creating what a reasonably prudent person would or should know was a highly dangerous hazard, coupled with its omission to notify the injured plaintiff of the danger or to prevent him from subjecting himself to it, justified a finding of such a reckless indifference to the probability of injury as to constitute willful and wanton misconduct.

### III

Defendants contend that the injured plaintiff was guilty of contributory negligence as a matter of law. We cannot agree. In dealing with such a contention, all the testimony and inferences therefrom must be taken in the most favorable light to the plaintiff. After doing so, a dismissal on that ground can be granted only when reasonable men would not disagree that plaintiff's mishap was contributed to proximately by his own lack of care.

In this case the problem has two aspects, both of which in our judgment were properly presented to the jury by the trial court. As we have indicated above, the facts warranted the jury in finding in favor of the injured plaintiff on the issue of willful and wanton misconduct. When such a finding may be made, the defense of contributory negligence takes on a different hue. In such cases, as the trial court charged the jury, the defense is applicable as a bar only if plaintiff's actions constitute willful and wanton disregard of his own safety. It is only when plaintiff recklessly and with indifference to the high probability of injury to himself from defendant's willful and wanton misconduct exposes himself to that risk and thereby contributes proximately to his injury that the rule of contributory negligence will bar him. *Tabor v. O'Grady, supra,* 61 *N. J. Super.* at 453. In *Tabor,* the Appellate Division said that "contributory wantonness" would exist when the plaintiff had or should have had knowledge of existing dangerous conditions, and conscious from such knowledge that injury will

likely or probably result from his conduct, with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits some duty which contributed to his injury. 61 *N. J. Super.* at 454–455. See also *Borelli v. Frollani,* 98 *N. J. Super.* 203 (App. Div. 1967); *Graham v. Seaboard Air Line Railroad Co.,* 250 *F. Supp.* 566 (D. S. C. 1966); *Zank v. Chicago, Rock Island & Pacific Railroad Co.,* 17 *Ill.* 2d 473, 161 *N. E.* 2d 848 (1959); *Bogle v. Conway, supra,* 422 *P.* 2d 971; *Stinson v. Daniel,* 220 *Tenn.* 70, 414 *S. W.* 2d 7 (1967); *Ferguson v. Jongsma,* 10 *Utah* 2d 179, 350 *P.* 2d 404 (1960). This rule is supported by the great weight of authority in this country. 2 *Harper & James, Law of Torts,* § 22.6, p. 1213 (1956); *Prosser, Torts,* § 64, pp. 436–37 (3d ed. 1964); *Restatement, Torts* 2d, *supra,* § 482, p. 538; Annotation, Wanton or willful misconduct by person killed or injured as defense to an action based on wanton or willful misconduct of defendant, 41 *A. L. R.* 1379 (1926); 65A *C. J. S., Negligence,* § 131(a) (1966).

In light of that principle, clearly there is no basis for denying McLaughlin a recovery as a matter of law because of contributory negligence. As we have said, he was not obliged to make a critical inspection of the diving platform and the lake before diving. It was open to the jury to find that the appearance and location of the platform in relation to the water constituted an invitation to dive and a representation that the water was of sufficient depth to permit ordinary diving with safety. The implied representation was of particular potency because of the water's murky condition which prevented a view of the bottom. See *Vukas v. Quivira, Inc.,* 166 *Kan.* 439, 201 *P.* 2d 685, 688 (1949); *Hanson v. Christensen, supra,* 145 *N. W.* 2d a t872; *Boll v. Spring Lake Park, Inc., supra,* 358 *S. W.* 2d at 863; *Cummings v. Borough of Nazareth, supra,* 233 *A.* 2d at 879. Moreover, additional justification for reliance upon the apparent invitation could be found

in the absence of warnings or notices either that diving was prohibited or that the water was shallow, or in the failure to construct a fence or bar across the front of the platform, or in the failure on a busy day to post a guard on or near the platform to prevent diving. The nearby sign saying that swimming and diving were at the patron's risk was of little significance. In effect it did no more than call to the bather's attention that he assumed the ordinary and usual risks which inhere in the sport of swimming and diving. It did not serve to put him on guard as to any extraordinary hazards created by defendant Farms. See *Griffin v. DeGeeter,* 132 *N. J. L.* 381, 383 (E. & A. 1945); *Pona v. Boulevard Arena,* 35 *N. J. Super.* 148, 153 (App. Div.), *certif. den.* 19 *N. J.* 326 (1955); *Morse v. State,* 262 *App. Div.* 324, 29 *N. Y. S.* 2d 34 (Sup. Ct.), *app. dism'd* 287 *N. Y.* 666, 39 *N. E.* 2d 288 (1941).

What we have said of McLaughlin's conduct in relation to the issue of contributory "wantonness" applies as well to the defense of contributory negligence asserted by defendants on the negligence aspect of the case. Only a matter of degree is involved — proof of a lower grade with respect to lack of care by plaintiff would be sufficient to bar recovery on the negligence count. That is, plaintiff was obliged to use reasonable care for his own safety, and if, after viewing all the evidence most favorably to him, reasonable men could not say reasonably that he did not contribute proximately to the accident, his recovery should be barred as a matter of law. Appraising the injured plaintiff's conduct, as we have outlined it above, we have no doubt that the issue of contributory negligence in the negligence aspect of the case was for the jury to determine, and the trial court did not err in submitting it to them. *Vukas v. Quivira, supra,* 201 *P.* 2d 685; *Hanson v. Christensen, supra,* 145 *N. W.* 2d 868; *Boll v. Spring Lake Park, Inc., supra,* 358 *S. W.* 2d 859; *Cummings v. Borough of Nazareth, supra,* 233 *A.* 2d 874.

## IV

In their brief defendants combine a number of alleged errors to support a claim that the trial was conducted in an unfair and prejudicial manner. They involve denial of motions for mistrial, asserted misstatements of fact by the court in its charge, an alleged error in admitting in evidence certain drug bills, and criticisms of plaintiffs' attorney's opening and closing remarks to the jury. In our judgment neither singly nor in their totality do these criticisms warrant a conclusion that defendants suffered prejudicial error, nor are they of sufficient consequence to require individual discussion.

## V

It follows from all that we have said above that the trial court was correct in submitting the issues of defendants' willful and wanton misconduct and negligence to the jury. In addition it properly defined and sent to the jury the defense of contributory negligence as it was to be tested on each of the two liability aspects of the case. The evidence was sufficient to permit a verdict against defendants on either or both charges of liability, and thus the general verdict in favor of the plaintiffs must be sustained.

Accordingly, the judgment of the Appellate Division is reversed, and that of the trial court is reinstated and affirmed.

*For reversal*—Chief Justice WEINTRAUB. and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.