783 A.2d 741 (2001)
345 N.J. Super. 94
Christopher GRECCO, a minor by his Guardian ad Litem, Richard Grecco, and Richard Grecco and Sabrina Grecco, Individually, Plaintiffs,
v.
UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY, University Hospital, Susan Makowsky, R.N., Angela Brown, R.N., Cathleen Faliciani, R.N., Viswanathan Niranjan, M.D., and Ling Yu Shih, M.D., Defendants.
George Samuels, Joseph Licata and University of Medicine and Dentistry of New Jersey, Third Party Plaintiffs/Respondents,
v.
Sabrina Grecco and Richard Grecco, Third Party Defendants/Appellants.
Superior Court of New Jersey, Appellate Division.
Argued October 9, 2001.
Decided November 7, 2001.
Joseph M. Powell, Old Bridge, argued the cause for appellants (Parsons, Powell & Lane, attorneys; Mr. Powell, on the brief).
Gary L. Riveles argued the cause for respondents (Dughi, Hewit & Palatucci, attorneys; Mr. Riveles, on the brief).
Before Judges HAVEY, COBURN and WEISSBARD.
The opinion of the court was delivered by HAVEY, P.J.A.D.
In Foldi v. Jeffries, 93 N.J. 533, 546-47, 461 A.2d 1145 (1983), the Supreme Court preserved the doctrine of parental immunity in cases involving the negligent exercise of parental authority or provision of customary child care. However, if the parents' behavior is willful and wanton, the parental immunity doctrine does not apply. Id. at 547, 461 A.2d 1145. In this case, *742 plaintiffs Richard and Sabrina Grecco (plaintiffs), individually, and Richard Grecco, as guardian ad litem of their son, plaintiff Christopher Grecco, filed a malpractice action against defendant University of Medicine and Dentistry of New Jersey (UMDNJ) and various hospital employees. Christopher suffers from carbamyl phosphate synthetase deficiency (CPSD). Plaintiffs claim that while Christopher was hospitalized and suffering an episode of hyperammonemia at the University Hospital, the UMDNJ staff negligently administered to Christopher an insufficient dose of medication. Plaintiffs allege that as a result, Christopher suffered severe permanent neurological damage.
UMDNJ filed a third-party action against plaintiffs, asserting that they negligently or intentionally failed to obtain a liver transplant for Christopher, which, it alleges, would have cured Christopher of CPSD. The hospital's claim is predicated on the fact that plaintiffs' older son, Richard, who also suffered from CPSD, successfully underwent a liver transplant for treatment of that disease while an infant. The trial court denied plaintiff's motion for summary judgment to dismiss the third-party complaint. We granted leave to appeal and now reverse.
The salient facts are undisputed. Christopher was born on August 15, 1994, with CPSD, a hereditary genetic disorder involving the absence of a natural enzyme which detoxifies excess nitrogen in the body. Patients with CPSD are subject to toxic buildup of nitrogen, known as hyperammonemia. CPSD is a urea cycle disorder which, if not treated, can cause irreversible and progressive brain damage or death.
Plaintiffs' oldest son, Richard, who was born six years before Christopher, also suffered from CPSD. At sixteen days of age, Richard underwent a successful liver transplant, which involved a seven-month hospital stay. Richard had a good recovery and, since the transplant, has had no complications associated with CPSD.
Christopher was diagnosed with CPSD prenatally. After delivery, he was placed in intensive care and underwent treatment for hyperammonemia. He received several medications including sodium benzoate, sodium phenylacetate and arginine hydrochloride, and was placed on a protein-restricted regimen. On October 18, 1994, two months after Christopher's birth, defendant Dr. Ling Yu Shih, a UMDNJ physician treating Christopher, wrote to plaintiffs' medical insurance carrier seeking approval to treat Christopher by strict dietary control of total protein intake, with special attention given to reducing nonessential amino acids. Dr. Shih recommended use of Cyclinax, a medical food specially designed to manage urea cycle disorders and other protein-free products to supply necessary calories. Dr. Shih also recommended consultations with a qualified nutritionist and clinical biochemical geneticist. He advised that, "[w]ith the appropriate nutritional support and strict medical supervision, I am confident that Christopher Grecco can best achieve his growth and development potential and avoid the devastating consequences of urea cycle disorder." In his deposition, Dr. Shih repeated his view that the dietary protocol recommended by him was "effective." He added that he had utilized the same protocol on at least six of his other patients.
Based on consultations with Dr. Shih, plaintiffs chose to treat Christopher's disorder conservatively by following a strict dietary protocol. During the ensuing months, Christopher experienced brief episodes of hyperammonemia for which he was treated with medication. At one point, in March 1995, he was admitted to *743 Johns Hopkins Hospital after experiencing vomiting and dehydration. His ammonia level was elevated. Christopher had suffered a diffuse cerebral edema. He was thereafter hospitalized on three occasions in June and July 1995. On November 11, 1995, he was admitted to University Hospital where meningitis was diagnosed. Nevertheless, Christopher continued to make progress. He began to walk, he was happy and affectionate, had dressing skills and demonstrated independence.
On November 24, 1996, Christopher was admitted to University Hospital after experiencing vomiting and irritability. Once again, his ammonia levels were elevated. Physician orders directed that Christopher "should receive 3.25 grams each of sodium benzoate, sodium phenylacetate and 26 ml of 10% arginine in 400cc of D10W to run at 17 cc/hr." According to plaintiffs' medical expert, the prescribed dosage concentration was negligently diluted by hospital personnel and, due to the error, "Christopher received only 25% of the medication which he should have been receiving." The expert states that, as a consequence, Christopher suffered an episode of hyperammonemia leaving him with severe permanent neurological damage.
In denying plaintiffs' summary judgment motion to dismiss UMDNJ's third-party complaint, the trial court stated that there were genuine fact issues as to whether plaintiffs' failure to have Christopher undergo a liver transplant was wanton and willful conduct. That conclusion was apparently based on the fact that plaintiffs knew that they were "carriers" of the gene which causes CPSD and that they had opted for a liver transplant for their oldest son, Richard, who suffered from the same disorder.
Foldi, supra, 93 N.J. at 545, 461 A.2d 1145, holds that "[t]here are certain areas of activities within the family sphere involving parental discipline, care, and control that should and must remain free from judicial intrusion. Parents should be free to determine how the physical, moral, emotional, and intellectual growth of their children can best be promoted." Consequently, the Court retained the doctrine of parental immunity in areas involving the exercise of parental authority or the provision of customary child care. Id. at 546, 461 A.2d 1145. In Foldi, the Court invoked the doctrine, barring an action against parents who negligently supervised their child, resulting in the child's wandering away from her residence over to a neighbor's residence where she was bitten on the face by a dog. Id. at 535, 461 A.2d 1145. The Court carved out an exception to the doctrine where the parent's failure to supervise his or her children is "willful or wanton," id. at 549, 461 A.2d 1145, that is:
It must appear that the defendant with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result.
[Id. at 549, 461 A.2d 1145 (quoting McLaughlin v. Rova Farms Inc., 56 N.J. 288, 305, 266 A.2d 284 (1970)).]
The Court in Foldi barred the daughter's suit because it found that the mother's lack of supervision "was, at worst, merely negligent." Id. at 550, 461 A.2d 1145.
The Foldi rationale was applied by the Law Division in DeMarco v. DeMarco, 274 N.J.Super. 257, 643 A.2d 1053 (Law Div. 1992), aff'd o.b., 274 N.J.Super. 210, 643 A.2d 1029 (App.Div.), certif. denied, 138 N.J. 264, 649 A.2d 1285 (1994), in the context of a parent's decision to take her daughter, who had previously been hospitalized *744 for drug abuse, to a crisis center. 274 N.J.Super. at 260, 643 A.2d 1053. While driving to the center, the daughter became agitated, jumped out of the car and sustained severe injuries. Id. at 261, 643 A.2d 1053. She sued her mother. The Law Division invoked the parental immunity doctrine because the mother "was clearly caught on the horns of a dilemma": she could have stopped the car when the daughter exhibited aberrant behavior, or proceeded to the crisis center. Id. at 262, 643 A.2d 1053. The court reasoned that the choice of proceeding to the center was a reasonable exercise of discretion, observing that "[a] decision whether to have a child treated for an emotional problem, and the time and manner of treatment falls within a parent's philosophy of child-raising." Id. at 263, 643 A.2d 1053. The court concluded that that decision "involves an essential element in providing customary child care which should be free from judicial intrusion." Ibid.
DeMarco's analysis of the Foldi holding makes clear that the provision of medical service on a child's behalf is obviously a vital component of customary parental child care. Nothing is more important than a parent's choice of a medical procedure, treatment or protocol which, according to their reasoned judgment, will best protect and promote the physical and mental well-being of the child. Necessarily, that difficult choice implicates the family's economic, educational, cultural, ethical and religious background, subjective factors which may often be at the core of the decision-making process. Foldi, supra, 93 N.J. at 545, 461 A.2d 1145.
Further, "[a]s each parent is different, so is each child." Id. at 546, 461 A.2d 1145. A particular medical regimen selected for one child may be deemed in that child's best interest, considering the nature of the child's condition, the treatment available, and the medical advice received by the parents. A parent cannot necessarily be faulted for choosing a different course for a second child, suffering from the same condition as the first, when changed circumstances, familial attitudes and experiences, and alternative, less intrusive medical protocols are recommended by treating physicians. In such circumstances, courts have no business second-guessing parental medical-care decisions by exposing parents to judicial intervention. It is for that very reason that Foldi rejected a simple negligence standard, because such a standard "would impose the State's views on parenting techniques onto the citizens of this State." G.S. v. Department of Human Servs., 157 N.J. 161, 179, 723 A.2d 612 (1999).
Considering the evidentiary material in a light most favorable to UMDNJ, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995), no reasonable fact-finder could conclude that plaintiffs were indifferent, let alone "recklessly or consciously indifferent," Foldi, supra, 93 N.J. at 550, 461 A.2d 1145, to Christopher's condition. From the moment of his birth, they sought medical care for their son, faithfully adhered to the advice given by the professionals, followed the strict dietary regimen prescribed by the doctors, and hospitalized Christopher every time he exhibited signs of hyperammonemia. It cannot be said that plaintiffs "`consciously and intentionally [did] some wrongful act or omitt[ed] to discharge some duty'" which produced the injuries suffered by Christopher. Ibid. (quoting McLaughlin, supra, 56 N.J. at 305-06, 266 A.2d 284).
We specifically reject UMDNJ's argument that, because plaintiffs' oldest son Richard was successfully treated for CPSD by undergoing a liver transplant, plaintiffs' decision not to have Christopher undergo the same surgery creates a fact *745 issue as to whether their conduct was willful and wanton. Richard was subjected to the transplant at sixteen days of age. It is not unreasonable to conclude that the transplant procedure was a deeply upsetting and emotional episode in plaintiffs' lives. Moreover, the complexity and invasive nature of the transplant procedure obviously exposed Richard to substantial risk. Indeed, he was hospitalized for seven months after the operation. Plaintiffs' decision to follow a more conservative protocol than surgery for Christopher can hardly be faulted.
Furthermore, the record is clear that plaintiffs followed the recommendations of their treating physicians when they agreed to the strict dietary protocol and drug medication treatment instead of the transplant surgery alternative. Indeed, it was UMDNJ's own employee, Dr. Shih, who recommended the protocol. In his October 18, 1994 letter to plaintiffs' medical insurance carrier, Dr. Shih stated expressed his confidence that, following this recommended nutritional protocol and strict medical supervision, Christopher "can best achieve his growth and development potential and avoid the devastating consequences of urea cycle disorder." In his deposition, Dr. Viswanathan Niranjan, another UMDNJ employee, agreed with Dr. Shih that the protocol Christopher was following was "effective" up until his November 25, 1996 hospitalization. In our view, it is disingenuous for UMDNJ to argue that plaintiffs' decision to follow the advice of Dr. Shih, its own staff member, constitutes willful and wanton conduct.
Reversed and remanded for entry of summary judgment dismissing UMDNJ's third-party complaint.