# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1989-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

M.K.,

      Defendant-Appellant,

and

Y.R.B.,

      Defendant.

_____

IN THE MATTER OF R.K.,
a minor.

_____

      Submitted February 10, 2021 – Decided May 4, 2021

      Before Judges Accurso and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FN-13-0090-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Laura M. Kalik, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Minor has not filed a brief.

PER CURIAM

Defendant M.K.[1] appeals from a March 11, 2019 order finding she abused or neglected her thirteen-year-old son, R.K. (Ryan), by failing to arrange for his care when she left him home for multiple days in September and October 2018. We reverse.

---

[1] We use initials and fictitious names for the parties involved in this matter to protect their privacy and preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

A-1989-19

I.

Ryan was born in 2005 and raised by his maternal grandfather, W.K. (Wayne), and step-grandmother, D.D. (Dina). When Wayne passed away in March 2018, defendant assumed physical custody of Ryan.[2]

On October 3, 2018, defendant's next-door neighbor, M.L. (Mae), called the Division of Child Placement and Permanency to report Ryan "resides with his mother . . . and adult cousin [Iris]," but defendant "left the home on Sunday, [September 30, 2018] . . . and did not come home until [October 2, 2018]." Further, Mae informed the Division that when she initially learned Ryan was home without his mother, she told Iris she would maintain the child's schedule by picking him up and dropping him off at school if defendant did not return. Additionally, Mae reported that when defendant returned home on October 2, she was "under the influence," so Ryan stayed with Dina that night.

Amber Cannon, a Division caseworker, went to defendant's home twice on the evening of October 3 to speak with defendant. No one answered the door. That same night, Cannon interviewed Dina and Ryan. Ryan told Cannon his mother left home the previous Saturday, after they had gone out to lunch for her

---

[2] Ryan's biological father, Y.R.B, is not a party to this appeal and was not involved in the fact-finding hearing.

A-1989-19

birthday. His mother told him she was going to a friend's house and would return around eight or nine o'clock that night. Because she did not come home as planned, Ryan called his mother's cell phone. She answered, crying, and told him she would be home soon. Ryan also told Cannon that on Sunday, Iris was home "for a little bit but then [Mae] came to the home and had her leave." Additionally, Ryan claimed he "spent Sunday at [Mae's] house" and after he attended school the following day, he stayed at Dina's house. Ryan told Cannon that when he called his mother on October 2, she again was crying and did not know when she would be home. He reported no other contact with his mother during her absence. Further, Ryan "denied that his mother left him with a plan for a caregiver while she was gone." When Cannon asked Dina who else resided in defendant's home, Dina informed her defendant's cousin, Iris, "was residing in the home but no longer live[d] there."

On October 4, 2018, Cannon met with defendant. Defendant "admitted to leaving [Ryan] home" on September 29 and not returning until October 2. Cannon asked her "who she had planned to be a caregiver for her son. She said that she did not have a plan, as her plan was to return home that Saturday evening, but she never returned, so she did not make a plan for her son." Defendant also admitted to using heroin and cocaine during her time away. She

4

tested positive for cocaine, opiates and buprenorphine on October 4. Additionally, she agreed to a safety protection plan, allowing Dina to care for Ryan while defendant addressed her mental health and substance abuse issues.

## II.

On November 13, 2018, the Division filed a Title Nine complaint and order to show cause, alleging defendant abused or neglected Ryan by leaving him home alone and failing to arrange for a caregiver in her absence. The Division requested care, custody and supervision of Ryan and asked that defendant submit to a substance abuse evaluation and comply with any treatment recommendations. The trial court granted the Division's application and allowed defendant liberal, supervised visits with Ryan. Subsequently, defendant relocated to Virginia to "get clean." Ryan lived with Mae until September 2019, when he ultimately reunited with defendant in Virginia.

## III.

The trial court conducted a fact-finding hearing on March 11, 2019. Defendant appeared telephonically for the hearing because she lived in Virginia at that time. Cannon was the sole witness to testify at the proceeding.

5

During direct examination, Cannon confirmed the Division established defendant for neglect following her investigation.[3] Cannon also described the steps she undertook to investigate Mae's referral, and testified about what defendant, Ryan, and Dina told her during her first interviews with them in October 2018. In response to the Division's question about whether Cannon asked Ryan who else lived in his home at the time of the incident, she stated, "he didn't confirm that [Iris] was still living in the home, but did say that she was there for a short period of time on Sunday." When asked by Ryan's law guardian where Ryan slept on September 29, 2018, Cannon testified Ryan stated he slept at home, but did not tell her "if anyone else was in the home that night."

Defendant's attorney asked Cannon during cross-examination if she knew Iris previously "had been used as a caretaker for" Ryan. Cannon replied she was not aware of that fact. However, she admitted she had been told Iris "was home

---

[3] "An allegation [of neglect] shall be 'established' if the preponderance of the evidence indicates that a child is an 'abused or neglected child' as defined in N.J.S.A. 9:6-8.21, but the act or acts committed or omitted do not warrant a finding of 'substantiated.'" N.J.A.C. 3A:10-7.3(c)(2). An allegation of neglect is deemed "substantiated" when "the preponderance of the evidence indicates that a child is an 'abused or neglected child' as defined in N.J.S.A. 9:6-8.21 and either the investigation indicates the existence of any of the circumstances in N.J.A.C. 3A:10-7.4 or substantiation is warranted based on consideration of aggravating and mitigating factors listed in N.J.A.C. 3A:10-7.5." N.J.A.C. 3A:10-7.3(c)(1).

for a little bit" on Sunday, September 30, but then Mae "came to the home and had her leave." Defendant's counsel asked Cannon, "[s]o, from your investigation and . . . mainly what [Ryan] told you, Ryan never told that he was alone without an adult, correct?" Cannon stated she never asked Ryan that question. Defense counsel inquired, "[w]ouldn't that have been an important question to ask a 13-year-old?" Cannon responded affirmatively. She also conceded on cross-examination that when she interviewed Ryan, he appeared "well cared for." Further, she stated she never entered defendant's home or spoke to Iris. Cannon explained no one answered the door when she went to defendant's home. Moreover, because Cannon was told Iris "was no longer in the residence, and she was not a perpetrator on the case," Cannon "did not make attempts to locate her."

Additionally, during cross-examination, Cannon acknowledged the Division's screening summary contained Mae's report that Ryan "resides with his mother . . . and adult cousin, [Iris]" but Cannon did not investigate how long Iris lived in the home. Asked if she thought it was important to know whether Iris "was living in the home . . . on September 30th when [Ryan] said he was left there," Cannon answered affirmatively. Cannon also testified she did not have Iris's contact information, could not recall asking anyone for that

7

information, and did not remember if she asked Ryan what he meant when he told her Mae had Iris leave Ryan's home.

Defense counsel asked Cannon about Mae's October 3 report to the Division that defendant left Ryan alone, but that "the cousin [Iris] was there." Cannon admitted these contradictory statements were reflected in the Division's records, but she did not "have any additional information to know which of [Mae's] statements is accurate."

As one point in the proceeding, the judge instructed defense counsel, "[y]ou should be focusing on what the real issues are. The real issues, as the court sees them anyway, is that you've got a child that says he was left alone . . . and you've got a mother who's confirmed it." Defense counsel responded, "[t]hat's not the testimony." He then had the following exchange with Cannon:

> Defense counsel: You testified that [defendant] told you she didn't have a plan, correct?
>
> Cannon: Correct.
>
> Defense counsel: But she never told you that she left the child alone, did she?
>
> Cannon: No.
>
> Defense counsel: In fact, she mentioned [Iris], correct?
>
> Cannon: I - - I don't recall.

A-1989-19

Throughout the proceeding, counsel for the parties addressed the admissibility of the Division's screening and investigation summaries. Defense counsel objected to the court considering certain statements in these documents, citing to relevancy and hearsay concerns. The judge initially declined to admit the screening summary offered by the Division, but he subsequently admitted it, "subject to some objections, if any." The judge explained, "the redacted portions may now have a greater relevance for the fact that they were said." Additionally, the judge sustained some of defendant's objections to statements referenced in the investigation summary. When defense counsel stated he was unclear about the totality of the judge's evidentiary rulings, the judge responded, "I'm going to make it very clear in my opinion what . . . I'm relying on."

During his closing remarks, defense counsel argued "the evidence was . . . that the child said he was in the care of his cousin until [Mae] came and told her to go away. Now, we don't know why she told her to go away, but it doesn't matter. The important thing is that [Ryan] went from one adult caretaker who was competent and approved, to another caretaker." Defense counsel acknowledged his client should have called Iris or Mae to alert them she was not coming home, but her mistake in not doing so "does not mean that she committed an act of gross negligence." Defendant's attorney then sought to admit two

contact sheets from July 26, and September 5, 2018 "to show that the cousin was in the home on both these occasions, and . . . was believed to be living in the home according to the notes." The Division objected to their admission, asserting the contact sheets were irrelevant. The judge sustained the objection.

At the conclusion of the hearing, the judge credited Cannon's testimony, finding it consistent with the screening summary. He also referred to defendant's admission that

> she had gone, I'll assume on a Saturday night thinking that she was only going to be gone for a few hours, and that [Ryan] would be alright. But she . . . got involved with drugs . . . and did not return till the following Tuesday night. During that period of time, she did not make any arrangements for [Ryan's] care. That implies that she knew that there was nobody there immediately in the house to care for him. She . . . would not have had to make arrangements if the cousin was in the house on a regular basis. It wouldn't have been necessary.
>
>     . . . .
>
> [T]his failure to attend for [Ryan's] care over this period of time and failure to plan for his safety and his wellbeing amounts to gross negligence. And therefore, I will enter a finding . . . that [Ryan] was, in fact, an abused or neglected child, having suffered the risk of serious harm.

A-1989-19

IV.

On appeal, defendant raises the following arguments:

I.   THE TRIAL COURT'S DECISION MUST BE REVERSED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A FINDING THAT [RYAN] WAS AN ABUSED OR NEGLECTED CHILD.

   a. THE RECORD BELOW DOES NOT PROVIDE SUFFICIENT COMPETENT EVIDENCE THAT [DEFENDANT]'S CONDUCT WAS GROSSLY NEGLIGENT OR RECKLESS WHEN SHE LEFT HER TEENAGE SON AT HOME FOR A SHORT PERIOD OF TIME ON ONE OCCASION WITHOUT MAKING EXPLICIT ARRANGEMENTS FOR HIS CARE.

   b. [THE DIVISION] FAILED TO PROVE BY A PREPONDERANCE OF ADEQUATE, SUBSTANTIAL, CREDIBLE EVIDENCE THAT [RYAN] FACED A SUBSTANTIAL RISK OF HARM OR IMMINENT DANGER WHILE BEING CARED FOR BY OTHER ADULTS DURING [DEFENDANT]'S ABSENCE.

II.  THE TRIAL COURT IMPROPERLY RELIED UPON INCOMPETENT HEARSAY EVIDENCE AND EXCLUDED RELEVANT PROBATIVE EVIDENCE.

We need not reach defendant's evidentiary argument in Point II because we are persuaded there was insufficient credible evidence in the record for the trial court to find the Division proved by a preponderance of evidence that defendant abused or neglected Ryan.

11

A-1989-19

Our Supreme Court has set forth the standards that govern our review of abuse or neglect matters as follows:

> [A]ppellate courts defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record. Indeed, we recognize that because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding.
>
> [N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010) (internal quotation marks and citations omitted).]

"[I]f there is substantial credible evidence in the record to support the trial court's findings, we will not disturb those findings." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 226 (2010). But "if the trial court's conclusions are 'clearly mistaken or wide of the mark[,]' an appellate court must intervene to ensure the fairness of the proceeding." Id. at 227 (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)) (alteration in original). We owe no deference to the trial court's legal conclusions, which we review de novo. State v. Smith, 212 N.J. 365, 387 (2012); Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995).

A-1989-19

An "abused or neglected child" means, in pertinent part, a child under the age of eighteen

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship.
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

Interpreting N.J.S.A. 9:6-8.21(c)(4)(b), our Supreme Court has instructed that mere negligence does not trigger the statute. Dep't of Child. & Fam. v. T.B., 207 N.J. 294, 306-07 (2011); G.S. v. Dep't of Human Servs., 157 N.J. 161, 177-78 (1999). Rather, the failure to exercise a minimum degree of care refers "to conduct that is grossly or wantonly negligent, but not necessarily intentional." T.B., 207 N.J. at 305 (quoting G.S., 157 N.J. at 177-78). Stated differently, the failure to exercise a minimum degree of care "at least requires grossly negligent or reckless conduct." Id. at 306.

Although the distinction from ordinary negligence cannot be precisely defined, McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970), the essence of gross or wanton negligence is that it "implies that a person has acted with reckless disregard for the safety of others," G.S., 157 N.J. at 179. Further, willful or wanton conduct is that which is "done with the knowledge that injury

13

is likely to, or probably will, result," and "can apply to situations ranging from 'slight inadvertence to malicious purpose to inflict injury.'" Id. at 178 (quoting McLaughlin, 56 N.J. at 305). However, if the act or omission is intentionally done, "whether the actor actually recognizes the highly dangerous character of her conduct is irrelevant," and "[k]nowledge will be imputed to the actor." Ibid. Such knowledge is imputed "[w]here an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences." Id. at 179.

A determination of whether a parent's or guardian's conduct "is to be classified as merely negligent, grossly negligent, or reckless can be a difficult one." T.B., 207 N.J. at 309. "Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." G.S., 157 N.J. at 181-82. "When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law." Id. at 182. The mere lack of actual harm to the child is irrelevant, as "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999).

Governed by these standards, we are satisfied the Division's proofs fell short of establishing defendant abused or neglected Ryan. Leaving aside that the record is devoid of evidence Ryan suffered harm when his mother left him home, the Division also failed to establish Ryan was left without a caregiver in the home or that defendant knew this to be true. Indeed, according to the screening and investigation summaries the Division introduced into evidence, which were minimally redacted, Mae notified the Division on October 3 that Ryan resided with his mother "and adult cousin [Iris]." Additionally, Iris was listed in both summaries as sharing the same home address as Ryan and defendant, with a notation in the screening summary that she was a "household member – secondary caregiver." Both summaries also reflected Iris "has a job so she cannot care for the child full-time," but there was no evidence provided to the court regarding Iris' hours or days of employment, nor did the judge make any findings about whether Iris still lived with defendant.

We also view as significant Cannon's admission she never asked Ryan if he was left alone without adult supervision after his mother left home. Similarly, she conceded this would have been "an important question to ask a 13-year-old." Moreover, Cannon testified defendant never specifically told her she left Ryan alone. Additionally, Cannon admitted she did not speak to Iris because she did

not have her contact information and could not recall asking anyone for that information. Further, she did not remember if she asked Ryan what he meant when he told her Mae had Iris leave Ryan's home.

Despite this critical testimony from Cannon, as well as the entries in the Division's summaries reflecting Iris lived in defendant's home and was Ryan's "secondary caregiver," the judge found defendant admitted she did not make any arrangements for Ryan's care and "[t]hat implies . . . she knew that there was nobody there immediately in the house to care for him. She . . . would not have had to make arrangements if the cousin was in the house on a regular basis."

Given Cannon's concessions on the stand, that most of her testimony was hearsay-based, and the contradictory proofs in the Division's two summaries, we cannot conclude that finding is supported by competent evidence, particularly because Cannon failed to ask Ryan if he was alone in his home or if Iris cared for him during his mother's absence. While we concur with defense counsel's closing remarks that defendant exercised poor judgment when she did not actively arrange for Ryan's care in her absence, we are similarly persuaded the Division failed to prove by a preponderance of evidence that defendant's conduct constituted gross negligence. In sum, the Division failed to prove Iris was not living in defendant's home as a "secondary caregiver" as indicated in the

Division's records, and thus that defendant left Ryan home knowing Iris was not available to care for Ryan. Accordingly, the fact-finding order is reversed.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1989-19