# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2186-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

D.A.,

      Defendant-Appellant/
Cross-Respondent,

and

F.M.,

      Defendant.

_____

IN THE MATTER OF N.A., a Minor,

      Respondent/Cross-Appellant.

_____

Argued June 4, 2019 – Decided July 10, 2019

Before Judges Messano, Gooden Brown and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0505-14.

Laura M. Kalik, Designated Counsel, argued the cause for appellant/cross-respondent (Joseph E. Krakora, Public Defender, attorney; Laura M. Kalik, on the briefs).

Noel Christian Devlin, Assistant Deputy Public Defender, argued the cause for respondent/cross-appellant (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Noel Christian Devlin, of counsel and on the brief).

Joseph Jude Maccarone, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason Wade Rockwell, Assistant Attorney General, of counsel; Joseph Jude Maccarone, on the brief).

PER CURIAM

Defendant appeals from a July 14, 2014 Family Part order entered after a fact-finding hearing where it was determined that he abused or neglected his then twelve-year-old son, N.A.,[1] within the meaning of N.J.S.A. 9:6-8.21(c). The Family Part judge concluded that by taking N.A. off "psychotropic medications" and "fail[ing] to follow up with mental health services" following "several incidents" of N.A. "inappropriate[ly] touching" other children,

---

[1] We use initials to protect the identity of those involved and to preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

including his then four-year-old half sister, D.A., defendant "placed his son and daughters[2] at risk of harm." The fact-finding order was perfected for appeal by a December 8, 2017 order, terminating the litigation.

Defendant contends "there was [in]sufficient evidence to support a conclusion that [he] failed to exercise a minimum degree of care within the meaning of [N.J.S.A. 9:6-8.21(c)(4)(b)]." In a cross-appeal, the Law Guardian supports defendant's position, adding that the evidence failed to "support a finding of medical neglect under [N.J.S.A. 9:6-8.21(c)(4)(a)]." In contrast, the Division of Child Protection and Permanency (Division) asserts that "[b]ecause the trial court correctly concluded that [defendant's] actions objectively failed to meet the minimum degree of care under N.J.S.A. 9:6-8.21(c)(4), and that his inaction both actually impacted and placed his children at substantial risk of harm, [we] should affirm." Because we agree the record lacks substantial credible evidence that defendant's conduct constituted gross negligence or recklessness, we reverse.

---

2 In addition to D.A., defendant had another daughter residing in the home, then three-year-old J.A. Defendant's live-in girlfriend was the biological mother of D.A. and J.A., but not N.A. It was unclear in the record why N.A. resided with defendant and his paramour as opposed to his biological mother.

A-2186-17T4

The fact-finding hearing followed the Division's emergency removal of N.A. on March 28, 2014, based on allegations of his sexual misconduct. Ultimately, the Division obtained custody of N.A. under N.J.S.A. 9:6-8.21 to -8.73 and N.J.S.A. 30:4C-12. At the hearing conducted on July 14, 2014, Division caseworker Yosef Hegazy and defendant's sister, R.P., testified for the Division. Documentary exhibits consisting of the Division's investigation summary and N.A.'s medical records were admitted into evidence. Defendant did not testify or call any witnesses.

Hegazy testified that the Division initially became involved with the family in February 2014,[3] after receiving a referral from the school "that [N.A.] had some marks on him." N.A. reported that his father hit him "for posting something on Facebook." During the ensuing investigation, defendant acknowledged the use of corporal punishment and told Hegazy "that N.A. was a pretty good kid[,]" but he "had some trouble with him being disobedient." The referral was ultimately ruled "[n]ot established." The following month, the Division received a new referral that "[N.A.] had inappropriately touched his sister" and exhibited "sexualized behavior." The referral was made by "a

---

[3] The Division had received a prior referral in 2010 alleging drug use by the parents. However, that allegation was ruled "unfounded."

member of PerformCare[,]" who had been contacted for therapeutic services by the social worker at N.A.'s school. Defendant had contacted the social worker, seeking professional help for N.A.

When Hegazy responded to the home, N.A. admitted "that he had touched [D.A.] in her vaginal area with his finger." N.A. was "very apologetic" and remorseful. However, when interviewed, D.A. gave a different account. She stated that while "she was lying flat on her stomach" in the bedroom, N.A. "pulled down her pants and put his thing in her butt." She denied that this had ever happened before. The girls' maternal grandmother lived in the home and cared for the children when the parents were not present. She had witnessed the incident between D.A. and N.A. and informed defendant.

Upon further questioning, N.A. disclosed to Hegazy that he had previously inappropriately touched "three other girls." According to N.A., "[t]he first incident occurred when he was seven years old; . . . the second incident occurred when he was ten years old; and the third [incident occurred] . . . in January of 2014." N.A. said the girls were six, four, and two-years-old, respectively. N.A. told Hegazy "his father had disciplined him" after each incident, by "hit[ting] him with a belt" and "[telling] him not to do it again." However, N.A. believed

"something [was] wrong with [him]" and asked his father to get him "psychological help."

Defendant, who was present during N.A.'s interview, confirmed the accuracy of N.A.'s account. Defendant also acknowledged for the first time that "one of the reasons" he had hit N.A., prompting the prior February 2014 physical abuse referral, was because of the January 2014 touching incident, during which N.A. had removed a child's diaper and touched her inappropriately. Defendant explained that to ensure continuous adult supervision in the home, the girls' grandmother watched them in the afternoon after 3:00 p.m. when they returned from school. In addition, N.A. and the girls had separate bedrooms. Defendant stated that upon learning of the incident with his daughter, he had contacted the school social worker for help and was going to contact PerformCare that night to assess N.A. Defendant acknowledged "he had [n]ever . . . taken N.A. to get mental health services or . . . counseling" previously because he thought N.A. was just curious. However, he was now concerned that there was a more serious problem.

As an alternative to the Division removing N.A., defendant told Hegazy that "his plan . . . to address the behavior" was to "send N.A. to Haiti" to stay with relatives. When Hegazy rejected that plan, defendant offered to have his

mother come from Haiti to take N.A., or for him (defendant) to leave the home with N.A. However, according to Hegazy, these were not viable options because "[t]here was no specific timeframe on when exactly [N.A.'s paternal grandmother] was going to come" and "[defendant] did[ not] have a plan as to where he was going to go or who he was going to stay with." Defendant also told Hegazy that N.A. had been "getting mental health services, as well as medication" while he was residing with his sister, R.P., in southern New Jersey. Defendant explained he had reached out to R.P., who was a registered nurse, for help with N.A. However, defendant acknowledged that, without consulting a doctor, he "took [N.A.] off the medication" once he returned home because "N.A. was doing better."

R.P. confirmed that N.A. resided with her from the "end of August 2010" until "the last week of December [2010]." According to R.P., when defendant told her "that he needed some help with N.A.," she "volunteered" to take N.A. to expose him to "a different environment" because "he was getting [into] trouble at school" and "getting suspended a lot" for "[f]ighting, bullying[,] and not behaving." However, after spending time with N.A., she believed the problem was something other than "the environment" and took N.A. to see a psychiatrist. As a result, N.A. was diagnosed with oppositional defiant disorder

(ODD), received outpatient treatment at Underwood Hospital, and was prescribed "Risperdal." R.P. testified that the medication improved N.A.'s behavior significantly. When R.P. returned N.A. to defendant's home, she told defendant that "the discharge instruction[] was to continue the medication and to follow up with all the doctors." However, she later learned that defendant discontinued the medication because he thought it made N.A. "gain weight."

Following the hearing, in a terse oral decision, the judge determined he was "satisfied that the Division ha[d] proven its case by a preponderance of the evidence." The judge explained:

> You have a child who has serious problems going on for years. You allow it to go on until it really hits home and a family member gets injured and . . . hurt. That[ is] when you come forward.
>
> You . . . deal with it by hitting the kid. You deal with it by sending him off to live with [your] sister, who did, by the way, really get him services for the first time, real services that he needed and medication. And as soon as he gets home, well, we do[ not] need any services anymore. We do[ not] need any medication.
>
> And then, it[ is] not until after the child touches and gets involved with one of his children that he finally wakes up. This should have been done the first time it was a problem, not . . . when the fourth child . . . is molested. It[ is] a little late then. You . . . not realizing that maybe this child needed help. Not realizing that [your] own children were at risk. This is just . . . sticking your head in the sand.

A-2186-17T4

. . . I[ am] satisfied this is not appropriate behavior, that this did put them at risk, did cause injury to one of his children . . . .

The judge entered a conforming order and these appeals followed.

On appeal, defendant raises the following points for our consideration:

THE TRIAL COURT'S DECISION MUST BE REVERSED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A FINDING THAT [DEFENDANT] ABUSED OR NEGLECTED [N.A.] BY FAILING TO PROCURE ADEQUATE MENTAL HEALTH CARE AND MEDICATION FOR HIM FOLLOWING INCIDENTS OF HIS INAPPROPRIATE[] TOUCHING OTHER CHILDREN[.]

A.   THE RECORD BELOW DOES NOT PROVIDE SUFFICIENT COMPETENT EVIDENCE THAT [DEFENDANT] FAILED TO EXERCISE A MINIMUM DEGREE OF CARE BY NEGLECTING TO PROVIDE ADEQUATE MENTAL HEALTH CARE TO [N.A.]

1.   [DEFENDANT]'S DECISION TO STOP [N.A.]'S MEDICATION DID NOT CONSTITUTE MEDICAL NEGLECT[.]

2.   [DEFENDANT]'S PROACTIVE EFFORTS TO ADDRESS [N.A.]'S MENTAL HEALTH NEEDS, WHICH OCCURRED ON MORE THAN ONE OCCASION, WAS NOT GROSSLY NEGLIGENT OR RECKLESS CONDUCT[.]

9

B. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A CONCLUSION THAT [N.A.] WAS AT SUBSTANTIAL RISK OF HARM OR FACING IMMINENT DANGER AS A RESULT OF [DEFENDANT]'S DECLINING TO CONTINUE [N.A.] ON MEDICATION OR SECURE ADDITIONAL MENTAL HEALTH SERVICES[.]

C. THE TRIAL COURT IMPROPERLY RELIED UPON INCOMPETENT HEARSAY TESTIMONY AND UNCORROBORATED OUT-OF-COURT STATEMENTS[.]

In the cross-appeal, the Law Guardian makes the following arguments:

A FINDING OF MEDICAL NEGLECT IS NOT SUPPORTED WHEN THE PARENT AFFIRMATIVELY SEEKS PROFESSIONAL HELP AFTER UNSUCCESSFULLY ADDRESSING THE ISSUE FOR A REASONABLE PERIOD THROUGH LESS INTRUSIVE MEANS.

A. [DEFENDANT]'S REQUEST FOR PROFESSIONAL HELP FOR [N.A.] IN [MARCH] 2014, AS OPPOSED TO JANUARY 2014, DOES NOT CONSTITUTE MEDICAL NEGLECT[.]

B. [DEFENDANT]'S DECISION TO DISCONTINUE [N.A.]'S MEDICATION WAS NOT SHOWN TO PLACE HIM AT IMMINENT RISK OF HARM[.]

We begin with a review of the applicable legal principles that guide our analysis. We accord deference to the Family Part's fact finding in part because

of the court's "special jurisdiction and expertise in family matters." Cesare v. Cesare, 154 N.J. 394, 413 (1998). We will uphold the trial court's fact finding if supported by sufficient, substantial, and credible evidence in the record, N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007), because the judge has had the opportunity to observe witnesses, weigh their credibility, and develop a "'feel' of the case." Id. at 293 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). However, we will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 38 (2011) (quoting M.M., 189 N.J. at 279) (reversing a court's "medical neglect" finding for lack of sufficient evidential support). We also accord no deference to the trial court's "interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

At the fact-finding hearing, the burden is on the Division to prove abuse or neglect "by a preponderance of the competent, material[,] and relevant evidence." N.J. Div. of Youth & Family Servs. v. C.H., 428 N.J. Super. 40, 62 (App. Div. 2012); N.J.S.A. 9:6-8.46(b). "Under the preponderance standard, a litigant must establish that a desired inference is more probable than not. If the

evidence is in equipoise, the burden has not been met." Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006) (internal quotation marks and citation omitted).

In pertinent part, an "[a]bused or neglected child" is a child under the age of eighteen

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his [or her] parent . . . to exercise a minimum degree of care (a) in supplying the child with adequate . . . medical . . . care . . . , or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]
>
> [N.J.S.A. 9:6-8.21(c)(4)(a) to (b).]

By requiring proof that a parent failed to exercise a "minimum degree of care" and "unreasonably inflicted or allowed to be inflicted harm, or created a substantial risk of inflicting harm," "[t]he statute makes clear that parental fault is an essential element for a finding of abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b)." N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 178-80 (2014).

Our Supreme Court has defined the phrase "minimum degree of care" as

> a lesser burden on the actor than a duty of ordinary care. If a lesser measure of care is required of an actor, then

something more than ordinary negligence is required to hold the actor liable. The most logical higher measure of neglect is found in conduct that is grossly negligent because it is willful or wanton. Therefore, . . . the phrase "minimum degree of care" refers to conduct that is grossly or wantonly negligent, but not necessarily intentional.

[G.S. v. Dep't of Human Servs., Div. of Youth & Family Servs., 157 N.J. 161, 178 (1999).]

"Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result[,]" and "can apply to situations ranging from 'slight inadvertence to malicious purpose to inflict injury.'" Ibid. (quoting McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970)). "Because risks that are recklessly incurred are not considered unforeseen perils or accidents in the eyes of the law, actions taken with reckless disregard for the consequences also may be wanton or willful." Ibid. Even if the parent is unaware of the "highly dangerous character of [his or] her conduct," if "the act or omission that causes injury is done intentionally," "[k]nowledge will be imputed to the actor[,]" and the parent will be liable. Ibid.

A determination of whether a parent's conduct "is to be classified as merely negligent, grossly negligent, or reckless can be a difficult one[,]" and is a question of law that is not afforded deference. Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 308-09 (2011). "Whether

13

a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." G.S., 157 N.J. at 181-82. "When a cautionary act by the [parent] would prevent a child from having his or her physical, mental[,] or emotional condition impaired, that [parent] has failed to exercise a minimum degree of care as a matter of law." Id. at 182. The mere lack of actual harm to the child is irrelevant, as "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999).

A finding of gross negligence depends on the totality of the circumstances and "is determined on a case-by-case basis." N.J. Div. of Child Prot. & Permanency v. K.N.S., 441 N.J. Super. 392, 398 (App. Div. 2015). See N.J. Div. of Youth & Family Servs. v. S.I., 437 N.J. Super. 142, 146-47 (App. Div. 2014) (finding no abuse or neglect where the custodial grandmother, believing her twelve-year-old granddaughter who expressed suicidal thoughts was simply "acting out," failed to take the child to the hospital for an immediate psychiatric evaluation); K.N.S., 441 N.J. Super. at 400 (affirming a finding of abuse or neglect based on the mother "placing [her child] in the care of an untrustworthy and impatient man about whom she knew very little, and by delaying the

emergency medical aid that the child needed" when the child exhibited signs of illness).

Here, we agree that the Division's proofs fell short of establishing that N.A.'s inappropriate touching of children occurred as a result of culpable conduct on defendant's part. Although the judge determined that defendant's failure to administer Risperdal to N.A. following the touching incidents harmed D.A., and placed N.A. and J.A. at risk of harm, a causal link was never established between the two by the Division's proofs. There was no evidence presented regarding the effects of Risperdal, the condition it was intended to treat, or the consequences of discontinuing its use. Although N.A.'s medical records were admitted into evidence, the judge made no mention of its contents to support his decision.

Instead, the only evidence elicited in that regard was R.P.'s lay testimony that Risperdal was prescribed to treat N.A.'s ODD. See N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 331 (App. Div. 2011) (requiring expert testimony to explain whether the level of marijuana shown on a parent's test result demonstrated impairment to the point of posing a risk to the child). Because there was no medical evidence, expert or otherwise, that Risperdal curbed sexualized behavior, or that discontinuing its use placed N.A. at risk of

harm, the judge's determination that defendant's actions were grossly negligent and the direct cause of N.A.'s sexual misconduct was based on an assumption, rather than proof. However, our Supreme Court has cautioned that judges "cannot fill in missing information on their own or take judicial notice of harm." N.J. Dep't of Children & Families, Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 28 (2013). It was the Division's burden to present "particularized evidence," which, in this case, it did not. Ibid.

Further, the judge's findings that defendant failed to follow up with mental health services for N.A., did not have a viable plan to address N.A.'s behavior, and was essentially "sticking [his] head in the sand" are belied by the record. On the contrary, when defendant found out about each incident, he took action. Initially, defendant disciplined N.A. through corporal punishment and verbal admonitions. He later sought help from his sister, a registered nurse. Ultimately, once he realized that the incidents were not a sign of mere curiosity but indicative of a more serious problem, he called the school social worker seeking professional help. Indeed, it was defendant's action that effected the Division's involvement.

Based on the totality of the circumstances, the record simply does not support a finding of abuse or neglect. The Division failed to prove by a

preponderance of the evidence that defendant's actions, consisting of a series of progressive interventions, rise to the level of recklessness or gross negligence as required under the statute. Not "every failure to perform a cautionary act is . . . abuse or neglect. When the failure to perform a cautionary act is merely negligent, it does not trigger section (c)(4)(b) of the abuse or neglect statute." T.B., 207 N.J. at 306-07. Further, based on this record, defendant's actions do not "reasonably rise to actionable 'medical neglect,' and the trial court findings to that effect are so wide of the mark as to be unsustainable." P.W.R., 205 N.J. at 38.

Therefore, the finding of abuse and neglect is reversed. Based on our decision, we need not address defendant's remaining arguments. The Division shall take appropriate steps to remove defendant's name from the Central Child Abuse Registry, N.J.S.A. 9:6-8.11, within thirty days of the date of this opinion.

Reversed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION