# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1795-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.P.,

     Defendant,

and

R.D.,

     Defendant-Appellant.

_____

IN THE MATTER OF E.D.,
a minor.

_____

Argued March 1, 2021 – Decided May 11, 2021

Before Judges Sabatino and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FN-15-0068-19.

Patricia Nichols, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Patricia Nichols, on the briefs).

Amy Melissa Young, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, on the brief).

Nancy P. Fratz, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy P. Fratz, of counsel and on the brief).

PER CURIAM

Defendant R.D.[1] appeals from the November 22, 2019 Family Part order terminating litigation following a fact-finding hearing that resulted in a finding that he abused or neglected his then nine-month-old son, E.D.,[2] within the meaning of N.J.S.A. 9:6-8.21. The finding was based on evidence that E.D. accidentally ingested an unknown substance on June 29, 2018, while in the care

---

[1] We use initials to protect the child's privacy. R. 1:38-3(d)(12).

[2] E.D. was born in September of 2017.

2

A-1795-19

of defendant and his biological mother, S.P.,[3] as a result of which E.D. suffered an overdose, was administered the opioid treatment Narcan, without which he could have died, and was hospitalized. A urine test conducted on E.D. at the hospital was positive for opiates, and defendant tested positive for a similar type of substance both before and after the incident. We affirm.

On October 25, 2018, the Division of Child Protection and Permanency (Division) filed a verified complaint against defendant seeking a finding of abuse or neglect under Title 9 and an order placing E.D. in the care and supervision of the Division under Title 30 in connection with the June 29, 2018 incident. A fact-finding hearing was conducted on April 2, 2019, during which the Division presented four witnesses and numerous documentary exhibits. Specifically, Little Egg Harbor police officer Jason Way testified about his response to the couple's apartment on June 29, 2018, after being dispatched on a 9-1-1 call regarding an infant in respiratory distress; Division caseworkers Rachel Clayton and Maria Bravo authenticated the Division's records and testified about the Division's involvement with the family after receiving the referral from the Little Egg Harbor Police Department; and Steven Kairys, M.D.,

---

[3] No finding of abuse or neglect was sought or made against S.P.

 A-1795-19

M.P.H., testified as an expert in the area of child abuse and pediatrics.[4] Defendant neither testified nor presented any witnesses on his own behalf.

At the hearing, Officer Way testified that when he arrived at the apartment complex on the evening of June 29, he was met outside by S.P., defendant, and a neighbor. S.P. was "carrying the infant," who "appeared lifeless" and "limp" with "pinpoint pupils, shallowed breathing, and a rapid pulse." Defendant told Way "he believe[d] . . . his uncle was counting Percocets . . . where the child was playing and may have dropped one" that the child then "ingested." Based on his training, Way recognized that E.D. "was suffering from an overdose of an opiate." Thus, he promptly "[d]eployed Narcan" on the scene and rode to the hospital with the infant and S.P. in the ambulance that had been dispatched with the 9-1-1 call. After "about [fifteen] minutes," E.D. "started coming around a little bit" and became "more responsive" while en route to the hospital. Another officer promptly reported the incident to the Division.

As a result of the referral, that night, Caseworker Clayton responded to Southern Ocean Medical Center (Southern) where E.D. had been transported and

---

[4] Dr. Kairys was qualified as an expert without objection.

spoke to S.P.[5] S.P. told Clayton that while she was cleaning the living room in the apartment, she "noticed" that E.D., who was playing in an adjoining play area, "was moving his mouth around." She "swiped her finger back and forth" in his mouth, but he did not appear to be "chewing on anything." However, "a few moments later, [E.D.] began to act very lethargic [and] limp, [and] his eyes were rolling in his head." In addition, E.D. "had . . . a bowel movement, which . . . was concerning" for S.P. "because he had already gone that day and typically [stuck] to his schedule" of going "once a day." After S.P. consulted with defendant, who was also "concerned," both she and her neighbor called 9-1-1 and "then went downstairs" to "wait[] outside for the ambulance to come."

Given the allegation that E.D. may have ingested some type of opiate, Clayton asked S.P. if there was drug use in the home. S.P. responded that defendant had "a history of [h]eroin abuse, but . . . to the best of her knowledge, he had been clean for the last two years and was being treated by a [m]ethadone program." Speculating about the possible source of the substance E.D. had ingested, S.P. told Clayton that defendant's uncle "who ha[d] a prescription for Percocets . . . had walked through the home earlier in the day" and may have

---

[5] Clayton testified that when she arrived at the hospital, S.P. and E.D. "were both covered in charcoal because . . . [E.D.] had been given charcoal to help empty his stomach."

A-1795-19

"dropped a Percocet." S.P. further surmised that "the neighbor who[m] she believe[d] receive[d] a prescription for narcotic pain medication" may have "dropped something as well."

Upon learning from S.P. that defendant was at the couple's apartment, Clayton traveled there to interview him. When questioned about his drug use, defendant told Clayton that, contrary to S.P.'s belief, "he had only been clean for the last two months." When defendant was asked to sign a release for records from his methadone program at John Brooks Recovery Center (John Brooks), "he indicated that it would return a positive . . . [drug] screen . . . as early as two months [prior]." However, he "adamantly [denied] current [drug] use or that there [were] any drugs . . . on his person at that time that could [have] fallen on the floor" of the apartment. Based on his drug use history, defendant confirmed that the symptoms E.D. exhibited were consistent with an opiate overdose and also "identified his uncle and the neighbor" to Clayton as possible sources of the substance E.D. ingested.

E.D. was transferred from Southern to Jersey Shore University Medical Center (Jersey Shore) at approximately 10:45 p.m. that night for further monitoring. He was discharged from Jersey Shore the following day. Prior to E.D.'s discharge, a safety protection plan was implemented in the home

requiring that both parents be supervised by designated relatives while the investigation was ongoing.

On July 2, 2018, Caseworker Bravo met with S.P. and administered a urine screen which was negative for illicit drugs.[6] Bravo arranged for defendant to come to the office on July 6, 2018, for drug screening, but defendant failed to report. As a result, on July 10, 2018, Bravo made an unannounced visit to the apartment and spoke to defendant. Once again, defendant "denied . . . kn[owing] . . . how [E.D.] got the . . . substance," indicated that he had started drug treatment seven months prior, and reiterated that he had one positive drug screen for opiates approximately two months prior.

Bravo arranged for defendant to undergo drug screening on two other occasions, July 12 and 19, 2018, but, again, defendant failed to appear. Bravo was also informed by defendant's counselor at John Brooks that defendant tested positive for opiates on July 10 and 23, and August 2, 2018. Due to defendant's record of ongoing drug use and continuous failure to undergo drug screening as requested by the Division, on August 3, 2018, the Division revised the safety protection plan, requiring defendant to move out of the couple's home and have

---

[6] S.P. continued to test negative for illicit drugs throughout the investigation.

supervised visitation with E.D. in a public setting while the investigation continued.

On August 7, 2018, Bravo spoke to defendant again to obtain contact information for the uncle who had been identified by both defendant and S.P. as a possible source of the substance E.D. ingested. However, during that conversation, contrary to his prior statement, defendant told Bravo "that the uncle didn't bring anything because he was not in the house."[7] Defendant also reiterated that he did not know "how [E.D.] got the substance."

After rescheduling defendant for a substance abuse evaluation three times, on August 9, 2018, defendant finally underwent a comprehensive substance abuse evaluation as requested by the Division. During the evaluation, defendant "reported being clean for [two-and-one-half] years up until [his] recent relapse" "at the end of October 2017," which prompted him to leave John Brooks in November 2017. Defendant also disclosed an extensive history of substance abuse involving the use of illicit substances as well as prescription medications.

---

[7] During Bravo's July 2, 2018 meeting with S.P., S.P. had also retracted her prior statement about defendant's uncle and told Bravo that he was not in the house on the date of the incident.

A-1795-19

Specifically, defendant "admitted to using pills[,] . . . heroin,"[8] and "cocaine." He told the evaluator that he "last use[d] . . . cocaine [two] weeks ago" and "heroin [one] week ago."[9] He "stated that he grew up with drug addicted parents" and "witness[ed] his father overdose [three] times as a child." He explained that he was "working with his father" and would "smok[e] crack cocaine with him" "after work." He stated he was "hiding [his] drug use from [his] paramour[]," S.P., who was not using drugs and had no "history of drug abuse." Defendant told the evaluator that after "using with [his] parents after work," he would "stay[] in Atlantic City until he no longer was high and then return[] home to [his] paramour and infant." He said that he had "overdosed [on heroin] in December 2017 but no one knew except for his parents," who "were using with him," and "his sister" who "picked him up" from the hospital.

Defendant further reported returning to John Brooks around April 2018 and resuming his methadone dosing but "failing [several] urine screens . . . for opiates." Specifically, defendant "tested positive for cocaine, opiates, and

---

[8] Defendant explained that after "building up a tolerance to pills," he "began us[ing] . . . heroin via nasal inhalation," and then "progress[ed] to intravenous use."

[9] Defendant "reported recent daily use of heroin" in conjunction with his methadone dosing.

prescribed [m]ethadone" on March 16, April 9, April 25, June 19, July 10, July 23, and August 2, 2018. He also tested positive for fentanyl on April 9 and 25, 2018. A urine drug screen collected during his evaluation on August 9, 2018, was also "positive for cocaine and [prescribed m]ethadone."

Regarding the June 29 incident, defendant told the evaluator that he never brought drugs into the couple's home. Although he speculated that E.D. "must have found a Percocet under the couch" and denied knowing the source of the pill, defendant reported that S.P. "was prescribed Percocet . . . following her gall bladder surgery, [the] maternal grandmother [was] prescribed Percocet . . . for back pain, and [the] neighbor," who was "helping [S.P.] with [the] baby [on a daily basis] following her surgery" was "also prescribed Percocet . . . for pain relief." Following the evaluation, defendant was diagnosed with severe opioid use disorder and moderate cocaine use disorder and recommended for intensive outpatient drug treatment.

Bravo interviewed the maternal grandmother and confirmed that she was prescribed Tramadol and Percocet. However, she denied ever bringing the medications to the couple's home. Bravo also interviewed the neighbor who confirmed that she was prescribed "Oxycodone . . . and Hydro morphine for back pain and . . . cysts" but denied taking her medications to the couple's home.

10

At the Division's request, Dr. Kairys conducted a medical evaluation of E.D. on July 5, 2018, and issued a report dated July 9, 2018, and an addendum dated August 20, 2018.  Kairys testified that during the evaluation, defendant explained to him the circumstances surrounding E.D.'s admission to the hospital, informed him about his methadone treatment, and speculated about the "possibility" of E.D. obtaining "Oxycontin" from "somebody [who] had visited the house."  Kairys reviewed the lab results of the urine sample taken from E.D. at Jersey Shore which "was positive for opiates" and "negative for aspirin or for Tylenol."  He also reviewed "[t]he blood test" which "was negative for acetaminophen."

Kairys opined that based on the level of acetaminophen reported, "it [was] unlikely" that E.D. ingested "Tramadol" which "is an acetaminophen combination," or "Percocet."  Kairys testified that ingestion of Percocet would normally result in a finding of acetaminophen in the urine.  He testified further that

> being positive for opiates generally indicates that the child had to ingest either [c]odeine, [m]orphine, or . . . some form of [h]eroin.  All those are the ones that are positive for opiates.  All the synthetic narcotics, like Oxycontin or Vicodin, . . . or [f]entanyl, even methadone do not test positive for just opiates unless there [is] a huge amount taken for the Oxycontin.  So, in general, [the lab results] narrow[] down what could

11

A-1795-19

[have been] taken to either [c]odeine, narcotic of some
sort, a [m]orphine narcotic or [h]eroin.[10]

Kairys explained that based on the information provided to him by defendant during the initial evaluation, "[he] was perplexed" and "at a loss" as to "what actually did occur" because neither defendant's methadone nor a dropped Oxycontin pill would have been "a likely cause" for E.D.'s reaction. Kairys explained that while one Oxycontin pill "could [have] caused [E.D.'s] symptoms," it would not result in a "positive" urine screen. However, when Kairys subsequently learned from the Division that "[defendant] had tested positive . . . for [c]ocaine, [m]ethadone, [c]odeine, and [f]entanyl," then he concluded that "one of those was a much more likely source for the narcotic that [E.D.] ingested." As a result, Kairys amended his opinion to conclude that "the accidental ingestion . . . occurred from something [defendant] had probably dropped on the floor."

Kairys defined "accidental" as E.D. "pick[ing] . . . up" the narcotic "because it had dropped on the floor," and "put[ting] it in his mouth," as opposed to "somebody actually giving it to him." Kairys also explained that although

---

[10] According to Kairys, "[c]odeine is a pill" and "[m]orphine could be a pill." Kairys was unaware whether "[h]eroin comes in a pill form."

E.D. "had no symptoms" when he evaluated him, depending on the quantity of ingestion,[11] and without the administration of Narcan, E.D. could have gone into respiratory depression and developed major complications that "could [have] been life threatening." Defendant presented no competing expert testimony at the hearing to counter Dr. Kairys' findings.

At the conclusion of the investigation, the Division substantiated the allegations of abuse or neglect against defendant based on the fact that defendant's ongoing drug use created a condition requiring E.D. to be hospitalized. See N.J.A.C. 3A:10-7.3(c)(1) (providing for an administrative finding that an allegation of abuse or neglect is substantiated "if the preponderance of the evidence indicates that a child is an 'abused or neglected child' as defined in N.J.S.A. 9:6-8.21 and either the investigation indicates the existence of any of the circumstances in N.J.A.C. 3A:10-7.4 or . . . the aggravating and mitigating factors listed in N.J.A.C. 3A:10-7.5"); see also N.J.A.C. 3A:10-7.4(a)(3) (requiring a substantiated finding when the

---

[11] Kairys testified that "[t]he urine test [was] a screening test" that did not report "quantity" but only reported "that there was some . . . of that narcotic in [E.D.'s] urine." Therefore, it was impossible for Kairys to quantify what E.D. had ingested. Additionally, according to Kairys, "in general," opiates are effective for "four to eight hours" and "opiates usually last in the urine for a number of hours and then disappear."

investigation indicates "[t]he infliction of injury or creation of a condition requiring a child to be hospitalized or to receive significant medical attention").

Following the fact-finding hearing, in an oral opinion, the judge found that the Division met its burden "by a preponderance of the evidence" that defendant "abused or neglected" E.D. within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b). Based on the testimony of the four witnesses, the judge determined "[t]here [was] no doubt that on June 29th of 2018, [E.D.], who [was] less than one[-]year[-]old, ingested some type of illicit substance that caused him to suffer pinpoint pupils, . . . rapid pulse, [and] shallowed breathing. He was lethargic and actually limp in his mother's arm[s]." The judge continued that E.D. "had to be administered Narcan, and was subsequently hospitalized." After he was administered Narcan, "it took a good [fifteen] minutes for [E.D.] to come back to some semblance of normalcy," and E.D.'s urine test at the hospital "was positive for opiates." The judge found further that at the time of the incident, "[defendant] was in a caretaking role and was testing positive both before and after the incident . . . for a . . . similar type of substance."

The judge acknowledged that "no one has said that . . . [defendant] at any time . . . intentionally gave his son some type of substance that caused these symptoms." The judge explained:

What happened was an accidental ingestion by [E.D.] However, the circumstances surrounding that accidental ingestion is where this [c]ourt finds that [defendant] did indeed display gross negligence. It does not [make] sense, especially in light of the testimony that only [defendant] and [S.P.] were home with the child when he had this reaction, that somebody walking through the home, accidentally dropped a pill out of their pocket or that they were counting pills . . . and one could have possibly fallen on the ground, especially in light of Dr. Kairys's testimony that Tramadol or Vicodin or none of those types of substances could have caused the positive urine result for opiates. Most likely, according to Dr. Kairys's unopposed testimony[, it] would be [caused by] [c]odeine or [m]orphine.

After scrutinizing the witnesses' testimony, defendant's August 9, 2018 substance abuse evaluation, and defendant's admissions to the evaluator, the judge concluded:

It is very clear from the testimony of the workers, as well as from the substance abuse evaluation and also the fact that [defendant] was not consistent with what he had initially told the worker that the uncle dropped a pill, . . . . that the evidence is more likely than not that whatever substance [E.D.] ingested was a result of . . . the current drug use by . . . [defendant].

It was an accidental ingestion by [E.D.], but it was grossly negligent on . . . [the part] of [defendant] because he was using drugs at the time and [E.D.] was able, somehow, nobody knows how, to ingest something that was left there by [defendant], not by somebody passing through the home at any time.

15

[Defendant] also refused to come in for several urine tests in July.

The judge entered a memorializing order and this appeal followed.

On appeal, defendant raises the following arguments for our consideration:

> THE TRIAL COURT'S JUDGMENT FAILS TO SATISFY R. 1:7-4, AS IT DOES NOT IDENTIFY THE STATUTORY ELEMENTS ANALYZED BY THE COURT OR CONTAIN CORRECT LEGAL CONCLUSIONS; IN LIGHT OF THESE ERRORS AND THE INEFFECTIVENESS OF TRIAL COUNSEL, THE JUDGMENT MUST BE REVERSED. (NOT RAISED BELOW).
>
> > A. The Court Issued a Judgment on a Cause of Action Completely Different From That Pled in the Complaint.
> >
> > B. The Evidence Adduced at the Fact[-] Finding Trial Did Not Support any Title 9 Cause of Action.
> >
> > C. [Defendant] Did Not Receive Effective Assistance of Counsel in Challenging the State's Case.
> >
> > D. The Trial Judge Failed To Recognize That the Proof at Trial Did Not Sustain the Complaint and Failed to Tether the Facts [S]he Did Find to Any Title 9 Cause of Action.

The Law Guardian joins with the Division in opposing the appeal.

A-1795-19

I.

"[B]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Moreover, appellate courts 'defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record.'" Id. at 342-43 (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). Thus, "[f]indings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Pascale v. Pascale, 113 N.J. 20, 33 (1988) (alteration in original) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

"Although we defer to the trial court's findings of fact, especially when credibility determinations are involved, we do not defer on questions of law." N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 330 (App. Div. 2011) (citing N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88-89 (App. Div. 2006)). Nonetheless, "[t]he judgment of a trial court in a

family-related matter 'should not be overthrown except upon the basis of a carefully reasoned and factually supported . . . determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.'" N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 616-17 (App. Div. 2010) (alteration in original) (quoting In re Adoption of a Child by P.F.R., 308 N.J. Super. 250, 255 (App.Div.1998)).

Pertinent to this appeal, "[a]buse and neglect actions are controlled by the standards set forth in Title Nine of the New Jersey Statutes." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 31 (2011). The purpose of a fact-finding hearing is "to determine whether the child is . . . abused or neglected. . . ." N.J.S.A. 9:6-8.44. "[T]he safety of the child shall be of paramount concern . . . ." N.J.S.A. 9:6-8.28(a), -8.31(a), -8.32. "If the facts are sufficient to sustain the complaint, the court will enter an order finding that the child is an abused or neglected child and set forth the ground for such finding." N.S., 412 N.J. Super. at 615 (citing N.J.S.A. 9:6-8.50(a)). In making a finding of abuse or neglect, a court considers "the totality of the circumstances, since '[i]n child abuse and neglect cases the elements of proof are synergistically related.'" V.T., 423 N.J.

Super. at 329 (quoting N.J. Div. of Youth & Family Servs. v. C.H., 414 N.J. Super. 472, 481 (App. Div. 2010)).

Regarding "the quantum of proof required in a fact-finding hearing brought under Title Nine, it is well established that [the Division] must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" P.W.R., 205 N.J. at 32 (citation omitted) (quoting N.J.S.A. 9:6-8.46(b)). "Under the preponderance standard, 'a litigant must establish that a desired inference is more probable than not. If the evidence is in equipoise, the burden has not been met.'" Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006) (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 5(a) on N.J.R.E. 101(b)(1) (2005)). "The evidence must demonstrate that the offered hypothesis is a rational inference, that it permits the trier[] of fact to arrive at a conclusion in a preponderance of probabilities to common experience." N.S., 412 N.J. Super. at 615 (alteration in original) (quoting In re Estate of Reininger, 388 N.J. Super. 289, 298 (Ch. Div. 2006)).

An "[a]bused or neglected child" includes a minor child

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . in providing the

child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, . . . or by any other acts of a similarly serious nature requiring the aid of the court. . . .

[N.J.S.A. 9:6-8.21(c)(4)(b).]

"It is difficult to marshal direct evidence of parental abuse and neglect because of the closed environment in which the abuse most often occurs and the limited ability of the abused child to inculpate the abuser." N.J. Div. of Youth & Family Servs. v. S.S., 275 N.J. Super. 173, 179 (App. Div. 1994). Consequently, in a fact-finding hearing under Title 9,

proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian shall be prima facie evidence that a child of, or who is the responsibility of such person is an abused or neglected child.

[N.J.S.A. 9:6-8.46(a)(2).]

"[N]on-intentional conduct is sufficient to warrant a finding of abuse if the injury to the child is demonstrated." N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 24 (2004) (citing G.S. v. Dep't of Human Servs., 157 N.J. 161, 175-82 (1999)). Because intent is not required to find abuse under Title 9, the trial court must determine "[w]hether a parent . . . has failed to exercise a minimum degree of care . . . in light of the dangers and risks

associated with the situation." G.S., 157 N.J. at 181-82. To that end, a parent "fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181. "When a cautionary act by the [parent] would prevent a child from having his or her physical, mental or emotional condition impaired, that [parent] has failed to exercise a minimum degree of care as a matter of law." Id. at 182.

Significantly, "minimum degree of care" refers to conduct that is "grossly or wantonly, negligent, but not necessarily intentional." Id. at 178. "Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." Ibid. (citing McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970)). "Because risks that are recklessly incurred are not considered unforeseen perils or accidents in the eyes of the law, actions taken with reckless disregard for the consequences also may be wanton or willful." Ibid. "Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes" and "[k]nowledge will be imputed to the actor." Id. at 178-79.

21

"Thus, under a wanton and willful negligence standard, a person is liable for the foreseeable consequences of [his] actions, regardless of whether []he actually intended to cause injury." Id. at 179. "[T]he inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger." Id. at 182. If a parent's act or omission does not meet the "minimum degree of care" required by law, the substantiated finding must stand. Ibid.; see also N.J. Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 306-09 (2011) (reaffirming the G.S. test).

Applying these principles, we agree with the judge that defendant abused or neglected E.B. within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b) and reject defendant's contentions that the judge's "findings [were] unsupported by either evidence or statutory elements." Instead, the preponderance of the evidence demonstrated that E.B. was injured by ingesting opiates he found on the floor of the couple's home while under their care. Unbeknownst to S.P., defendant, who had a drug history, had relapsed and tested positive for opiates on June 19 and July 10, approximately ten days before and ten days after the June 29 incident. Despite his denials about bringing drugs into the home, which denials were undermined by his false claims to S.P. and Division caseworkers about the onset

22

of his relapse, the evidence supported the conclusion that based on his documented drug use, it was more probable than not that defendant was the source of the opiates E.B. ingested. Indeed, rather than relying "solely on supposition and speculation" as defendant asserts, the judge properly applied the governing "preponderance standard" in determining that the "desired inference [was] more probable than not." N.S., 412 N.J. Super. at 615.

It was undisputed that the child's ingestion was accidental. However, intent was not required to support a finding of abuse or neglect on the part of defendant. "Even an isolated unintentional injury may form the basis for a finding of neglect where the intrinsic danger of the situation is obvious." G.S., 157 N.J. at 180. As the judge found, defendant's failure to exercise a minimum degree of care resulted in him recklessly causing injury to E.B. by his active drug use and constituted grossly negligent conduct. In that regard, we reject defendant's contention that "the judge did not tether her factual or legal conclusions to any specific Title 9 cause of action." On the contrary, the judge's factual findings, to which we owe deference, are supported by substantial, credible evidence adduced at the hearing, and the judge's legal conclusion that defendant's acts did not meet the "minimum degree of care" required by N.J.S.A. 9:6-8.21(c)(4)(b) was sound. "When a cautionary act by the [parent] would

prevent a child from having his . . . physical . . . condition impaired, that [parent] has failed to exercise a minimum degree of care as a matter of law." G.S., 157 N.J. at 182.

Defendant argues that "the State failed at trial to resolve th[e] basic dispute" regarding the source and type of substance and suggests that this failure was fatal to the State's case. We emphatically reject this argument for several reasons.

First, the danger that an infant may be seriously injured by having access to an opiate, regardless of the specific type, is readily apparent. That danger was realized when E.B. ingested an opiate that resulted in an overdose with the ensuing administration of Narcan and hospitalization. Second, although defendant and S.P. speculated that the substance may have been accidentally dropped by others who had access to the home — specifically, the neighbor, defendant's uncle, and the maternal grandmother — all three were ruled out by Dr. Kairys' uncontroverted expert testimony, defendant's and S.P.'s subsequent exoneration of the uncle, and caseworker interviews during which the neighbor and the maternal grandmother both denied bringing any substances into the couple's home. Further, because defendant's credibility regarding his drug use was undermined by his positive drug tests at John Brooks, his claim that he never

24

brought drugs into the home was rendered suspect and unreliable to refute the Division's proofs.

Defendant also raises procedural challenges, arguing for the first time on appeal that "no statutory provision of Title 9 had been pled." According to defendant, "[t]here was a surprise substitution of a Title 9 trial and judgment from a Title 30 complaint without any pleading of any of the nine Title 9 causes of action." We disagree.

Procedurally, "[f]ollowing an investigation, the Division initiates the civil action seeking an adjudication of abuse or neglect by filing a complaint in the Family Part, pursuant to N.J.S.A. 9:6-8.33." N.J. Div. of Youth & Family Servs. v. P.C., 439 N.J. Super. 404, 413 (App. Div. 2015). "The complaint must adequately notify a defendant of all charges." Ibid.; see also P.W.R., 205 N.J. at 36-37 (2011). Because "[t]he fact-finding hearing is a critical element of the abuse and neglect process," it "must be conducted 'with scrupulous adherence to procedural safeguards.'" P.C., 439 N.J. Super. at 413 (quoting N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 401 (2009)). To that end, "[a]t a minimum, 'due process requires that a parent charged with abuse or neglect have adequate notice and opportunity to prepare and respond.'" Id. at 412 (quoting N.J. Div. of Youth & Family Servs. v. T.S., 429 N.J. Super. 202, 213

(App.Div.2013)); see also N.J. Div. of Youth & Family Servs. v. B.M., 413 N.J. Super. 118, 126-27 (App.Div.2010) (noting that a defendant must be apprised by such notice of the matters at issue and be afforded an "adequate opportunity" to respond and prepare for trial).

Here, all procedural safeguards were scrupulously followed. The complaint specified that the "action [was] brought by the Division pursuant to [N.J.S.A.] 9:6-8.21 et seq. and [N.J.S.A.] 30:4C-12 and [Rule] 5:12-1 et seq. for the protection and best interests of [E.D.]" Further, the complaint was filed as a result of defendant "fail[ing] to ensure the health and safety of [E.D.]" and "endangering the welfare of [E.D.]" Additionally, the allegations in the complaint delineated the circumstances surrounding E.D.'s ingestion of opiates on June 29 as well as the Division's investigation and ensuing involvement with the family, including "requiring [defendant] to remain out of the home" due to his documented record of ongoing drug use and non-compliance with services. Finally, in the prayer for relief, "the Division request[ed] an order placing . . . [E.D.] in the care and supervision of the Division and, or, such other relief as . . . provided by law, specifically [N.J.S.A.] 9:6-8.21 et seq. and [N.J.S.A.] 30:4C-12, and . . . in the best interest of the child."

"A complaint . . . is not required to spell out the legal theory upon which it is based." Farese v. McGarry, 237 N.J. Super. 385, 390 (App. Div. 1989). "Its necessary contents are only 'a statement of the facts on which the claim is based, showing that the pleader is entitled to relief, and a demand for judgment for the relief to which he deems himself entitled.'" Ibid. (quoting R. 4:5-2). We are satisfied that the Division's complaint, which included allegations of conduct amounting to abuse or neglect against defendant within the meaning of N.J.S.A. 9:6-8.21, provided defendant with adequate notice and his contention to the contrary is belied by the record.[12]

Defendant seems to also suggest without support that the earlier administrative finding of abuse or neglect pursuant to N.J.A.C. 3A:10-7.3(c)(1), following the Division's investigation, precluded a later adjudication by the court that E.D. was an abused or neglected child or rendered it unnecessary. However, N.J.A.C. 3A:10-7.3(g) expressly provides that "[p]ursuant to N.J.S.A. 9:6-1 et seq., the Superior Court, Chancery Division, has jurisdiction to

---

[12] Notably, at the show cause hearing conducted on October 29, 2018, following the filing of the complaint, the judge determined "that the Division having care and supervision of [E.D. was] necessary to avoid an ongoing risk to [his] life, safety or health" because defendant was "actively using illicit substances; [E.D.] allegedly found a pill and ingested heroin or morphine; [E.D.] had to be treated with Narcan and [was] hospitalized."

adjudicate determinations that a child is an abused or neglected child" in conjunction with any administrative finding by the agency. See N.J.A.C. 3A:10-7.3(h)(1) (providing that the agency retains "the administrative authority" to "[d]etermine whether an allegation . . . determined to be abuse or neglect by the Superior Court, Chancery Division, is established or substantiated").  Moreover, litigation was not terminated until November 22, 2019, when the judge determined based on defendant's compliance with drug treatment services that reunification of the family was appropriate and termination of the litigation was "in the child's best interest."  Thus, we discern no deficiency in the pleading or the proceedings.

We next address defendant's claim that his attorney was ineffective for failing "to move to dismiss the Title 30 complaint for failure to state a cause of action," failing "to object to the admission of Dr. Kairys's ultimate issue opinion of neglect," failing "to highlight to the court that the State failed to prove where the pill came from or even what the pill was," and failing "to move for reconsideration or to vacate the judgment" after the judgment was issued.

"[A] defendant has a right to [the effective assistance of] counsel when a complaint is filed against him or her charging abuse and neglect and threatening the individual's parental rights."  N.J. Div. of Youth & Family Servs. v. B.H.,

391 N.J. Super. 322, 345 (App. Div. 2007) (citing N.J.S.A. 9:6-8.43(a)). In determining whether that right has been violated, we apply the test "as set forth . . . in Strickland [v. Washington, 466 U.S. 668 (1984)]." Id. at 346; see N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 308-09 (2007) (adopting the Strickland test in parental termination cases).

Specifically,

> (1) counsel's performance must be objectively deficient i.e., it must fall outside the broad range of professionally acceptable performance; and (2) counsel's deficient performance must prejudice the defense i.e., there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."
>
> [B.R., 192 N.J. at 307 (quoting Strickland, 466 U.S. at 694).]

The Strickland standard is "highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" B.R., 192 N.J. at 307-08 (quoting Strickland, 466 U.S. at 689). To establish the elements of an ineffective-assistance-of-counsel claim, "appellate counsel must provide a detailed exposition of how the trial lawyer fell short and a statement regarding why the result would have been

different had the lawyer's performance not been deficient. That will include the requirement of an evidentiary proffer in appropriate cases." Id. at 311.

Applying this standard, we reject each of defendant's ineffective assistance of counsel (IAC) claims in turn. First, because we discern no deficiency in the pleading or the proceedings, a motion to dismiss the complaint would have failed. Similarly, given our conclusion that the judgment was supported by the evidence and the law, defendant would not have prevailed on a motion for reconsideration or a motion to vacate the judgment. "[I]t is not ineffective assistance of counsel for defense counsel not to file a meritless motion. . . ." State v. O'Neal, 190 N.J. 601, 635 (2007) (citation omitted).

Further, in summations, defense counsel forcefully argued to the judge:

> the issue with this case is unfortunately . . . there was an accident where the child ingested something. The issue is, though, you don't know exactly what . . . and I think most problematic is Dr. Kairys's report where he essentially changes his position based upon additional information the Division obtains from John Brooks regarding my client's substance abuse history. I think there has to be something more as far as the Division's proof.
>
> We don't know what the child took. There were other people in the home . . . but I think there has to be something more in these types of cases.
>
> . . . .

30

> Dr. Kairys was not able to . . . indicate how long the half-life of any substances is and I think it's . . . purely within the realm of possibility that a child can get into something that was left or . . . fell from someone's pocket that doesn't have any bearing on . . . what my client did and any type of grossly negligent manner.

Clearly, defendant's assertion that defense counsel was ineffective for failing "to highlight to the court that the State failed to prove where the pill came from or even what the pill was" is belied by the record.

Finally, we consider defendant's claim that defense counsel was ineffective for failing "to object to the admission of Dr. Kairys'[s] ultimate issue opinion of neglect." Under N.J.R.E. 702, expert testimony "in the form of an opinion" is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. . . ." Under N.J.R.E. 704, such testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Indeed, "experts can offer reliable opinion testimony about the ultimate issue at trial." Jacober v. St. Peter's Med. Ctr., 128 N.J. 475, 497 (1992). This is common in Title 9 and Title 30 cases, in which the Division, Law Guardian, and defendants frequently seek experts who offer opinions as to the satisfaction or non-satisfaction of the pertinent statutory criteria.

Here, Dr. Kairys' opinion was neither objectionable nor inadmissible. Thus, defendant has failed to establish the elements required to prevail on any of his IAC claims.

Defendant's remaining arguments lack sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

32                                                                      A-1795-19